482 F.2d 234
 5 ERC 1705
 MORNINGSIDE RENEWAL COUNCIL, INC. and Riverside Democrats,
Inc., Petitioners,
v.
UNITED STATES ATOMIC ENERGY COMMISSION and United States of
America, Respondents,
Trustees of Columbia University in the City of New York, Intervenor.
 No. 524, Docket 72-2093.
 United States Court of Appeals,
Second Circuit.
 Argued March 12, 1973.
Decided July 5, 1973.
 
 John G. Lipsett, New York City, for petitioners.
 John Cho, Washington, D.C., (Martin R. Hoffmann, Gen. Counsel, Jerome Nelson, Sol., U.S. Atomic Energy Comm., Washington, D.C., Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark and Peter R. Steenland, Attys., U.S. Dept. of Justice, Washington, D.C., on the brief), for respondents.
 Edward A. Groobert, Washington, D. C. (John W. Wheeler, Thacher, Proffit & Wood, New York City, Bennett Boskey, Volpe, Boskey & Lyons, Washington, D.C., on the brief), for intervenor.
 Before HAYS, MULLIGAN and OAKES, Circuit Judges.
 HAYS, Circuit Judge:
 
 I. Introduction
 
 1
 This action seeks review of an order of the Atomic Energy Commission authorizing the Commission's Director of Regulation to issue a license to the Trustees of Columbia University to operate a Triga Mark II nuclear reactor located at 120th Street and Amsterdam Avenue in New York City. The reactor in question, which has already been built, will be used for the training of nuclear engineering students and for research and it can also be used to produce isotopes for medical research. It was constructed in a building on the Columbia campus following a 1963 Commission proceeding authorizing its construction. The petitioners herein did not participate in that proceeding and no appeal was taken from the Commission's decision.
 
 
 2
 The order at issue in this appeal consists of a decision of the Atomic Safety and Licensing Appeal Board dated May 18, 1972, 2 CCH Atomic Energy Law Rep. p 11,595, and an order of the same Board, dated July 28, 1972, denying a petition for reconsideration. The decision and order reversed a prior Initial Decision of the Atomic Safety and Licensing Board which denied authorization to operate the reactor. The parties to the proceeding before the Commission were two proponents of the operating license, Columbia, the applicant for the license, and the Regulatory Staff of the Commission, and three opponents of the license, the two petitioners herein, Morningside Renewal Council, Inc. and Riverside Democrats, Inc., and an individual intervenor who is not involved in this appeal. The members of the Appeal Board whose decision is being challenged are Dr. John H. Buck, a nuclear physicist, Dr. Lawrence R. Quarles, the Dean of the School of Engineering and Applied Science of the University of Virginia, and Algie A. Wells, an attorney.
 
 
 3
 This action presents us with several issues for review: First, whether the record before the Appeal Board, acting for the Commission, contains sufficient evidence to support its major findings that (1) the operation of the reactor will not be inimical to public health and safety, and (2) the issuance of the license does not constitute a "major federal action significantly affecting the quality of the human environment" requiring a detailed environmental statement to be issued under section 102(c) of the National Environmental Policy Act of 1969. Second, whether the Appeal Board erred in failing to implement certain rulings of the Licensing Board before it passed upon the application for authorization, whether the Appeal Board was justified in conducting additional evidentiary hearings in this proceeding and whether those hearings should have been held in New York City rather than in Washington, D.C. Finding substantial evidence in the record to support the Appeal Board's conclusions and noting no error in its procedural determinations, we reject the contentions of the petitioners, deny their petition for review and uphold the decision and order of the Appeal Board.
 
 II. The Factual Background
 
 4
 In 1963, Columbia sought and received a permit to construct the research reactor involved in this proceeding. The University acted pursuant to the provisions of the Atomic Energy Act, 42 U. S.C. Sec. 2011 et seq., which provides for a two-stage procedure for the licensing of nuclear reactors. Under the Act, applications for construction permits shall be granted "if the application is otherwise acceptable to the Commission," whereas licenses to operate the reactors shall be issued by the Commission
 
 
 5
 "[u]pon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this chapter . . . ."
 
 
 6
 42 U.S.C. Sec. 2235.
 
 
 7
 In dealing with licenses for reactors to be used for research and development and for medical therapy,
 
 
 8
 "[t]he Commission is directed to impose only such minimum amount of regulation of the licensee as the Commission finds will permit the Commission to fulfill its obligations under this chapter to promote the common defense and security and to protect the health and safety of the public and will permit the conduct of widespread and diverse research and development."
 
 
 9
 42 U.S.C. Sec. 2134(c).
 
 
 10
 The permit to build the Triga reactor was issued to Columbia after a full safety review by the Commission's Regulatory Staff and after a Federal Register notice had been published announcing the opportunity for a public hearing on the issue. No one sought such a hearing and no appeal was taken from the Commission's decision. The reactor was then constructed in a building on the Columbia campus.
 
 
 11
 In February of 1967, Columbia University applied for a license to operate the research reactor. One year later, the Commission's Regulatory Staff issued a Safety Evaluation which concluded that the reactor unit could be operated safely. The Commission thereupon announced its intention to issue the operating license and published a Federal Register notice inviting petitions to intervene from those whose interests might be affected by the issuance of the license. Applications were received from petitioners and one other person.
 
 
 12
 After the passage of more than one year (a period which included a delay requested by Columbia) the Commission issued a further Federal Register notice providing for a hearing before the Licensing Board and admitting petitioners as parties to the proceedings. The hearing was designed with particular emphasis on the issue of whether there was reasonable assurance that the reactor could be operated without endangering the public health and safety.
 
 
 13
 At the hearings, conducted in New York City in November, 1969 and July, 1970, testimony was presented by over twenty witnesses and resulted in more than 1,500 pages of transcript. On April 6, 1971, the Licensing Board issued its Initial Decision denying Columbia an operating license. Although the Board specifically found that in normal use the reactor could be operated safely without endangering the health and safety of the public and that the issuance of the license would not be inimical to the common defense and security, it concluded that it could not authorize the issuance of the license because of the absence of "applicable substantive criteria of the Commission and of convincing objective standards of the Regulatory Staff" dealing with the type of hypothetical accidents which are postulated for the purpose of determining the safety of particular reactors. In addition to this lack of standards, the Licensing Board noted that there were certain discrepancies in the experimental data submitted to it to be used for assessing the effects of the hypothetical accidents. The Board concluded that it had to "decline answering the question of whether the health and safety of the public would be endangered upon the occurrence of a postulated accident" because it considered it "inappropriate to enforce an answer derived from the narrow confines of a single proceeding and its own personal views about the degree to which the health and safety of the public ought to be protected against accident consequences." Suggesting the need for further experimentation as well as objective "accident" criteria relating to the danger to public health and safety, the Licensing Board denied the authorization to issue the operating license.
 
 
 14
 All of the parties involved filed exceptions to the Board's Initial Decision. The proceedings then went before the Atomic Safety and Licensing Appeal Board to which the Commission has delegated all of its adjudicatory authority. In June of 1971, following a review of the record, the Appeal Board determined that clarification of the record was necessary in certain areas before it could properly decide the issue. Therefore, it ordered that an opportunity for oral argument be afforded and that additional hearings be held before the Appeal Board directed particularly to three areas: the explanation of the discrepancies in some of the experimental data used to predict the release of radioactive fission products under postulated accident conditions; the criteria to be used to evaluate the predicted effects of the postulated accidents; and an additional explanation from Columbia of its security plans and procedures for preventing unauthorized access to the reactor area.
 
 
 15
 In May of 1972, after two days of hearings at which twelve technical experts testified, the Appeal Board issued its decision authorizing the issuance of the operating license. Its findings included the following: That when considered in light of the additional experimental data and clarifying information submitted to the Board, the release fission data were "reasonably consistent"; that the accidents hypothesized by the petitioners herein were not credible (thus affirming the Licensing Board's rejection of those hypotheses); that for the purposes of analysis it would adopt the Regulatory Staff's hypothetical accident situation which was more severe than any accident which had occurred during all previous experience with this type of reactor; that regulations as to postulated accidents for research reactors, which the Licensing Board had thought necessary, were not essential because even under the postulated conditions, any release of radioactive fission products would not exceed the guidelines for allowable releases of radioactivity for normal operations; and that therefore there was no danger to the public health and safety from the operation of the reactor. The Appeal Board did, however, impose additional security requirements upon Columbia as a condition of its obtaining the license.
 
 
 16
 On the basis of the entire record, the Appeal Board concluded that "issuance of the operating license will not be inimical to the health and safety of the public." After analyzing the potential environmental effect of the reactor, the Board determined that its operation "will not have a significant impact on the environment and, for that reason . . . an environmental statement under the National Environmental Policy Act is not required." On July 28, 1972, the Board denied the petitioners' request for reconsideration of its decision.
 
 III. The Substantive Claims
 
 17
 We deny the petition to review and we uphold the decision and order of the Commission's Appeal Board. We have examined the Appeal Board record and decision as well as the Licensing Board's Initial Decision and we find no grounds upon which to base reversal of the final order at issue herein. It is clear from the extensive and thorough record that the Appeal Board carefully considered all aspects of the issues involved in the granting of an operating license for this particular reactor. Since the challenged findings are supported by substantial evidence in the record, it is not within the competence of this court to overrule the Board's determination. See Scenic Hudson Preservation Conference v. Federal Power Comm'n, 453 F.2d 463, 468 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S. Ct. 2453, 32 L.Ed.2d 813 (1972).
 
 
 18
 The Board's decision that an environmental impact statement pursuant to the National Environmental Policy Act of 1969 was not necessary was based upon its threshold finding that the licensing involved in this case was not a "major federal action significantly affecting the quality of the human environment." This finding too was supported by substantial evidence in the record and the Board's decision was clearly not arbitrary and capricious. On this issue, the agency has the authority to make its own threshold determination. See Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972); Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir.), cert. denied sub nom. Hanly v. Kleindienst, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). Moreover, in this instance, there was a reviewable environmental record made with the participation of the public so that the finding that no NEPA statement was necessary was made by the Board with full knowledge of all of the environmental questions raised by the petitioners. Here the underlying issue was "safety" and the inquiry into that area was detailed and entirely adequate.
 
 IV. The Procedural Claims
 
 19
 Petitioners contend that rulemaking rather than adjudicatory proceedings should have been conducted in this case. However, that decision is one for the agency to make for that is where the expertise which is necessary to make such a determination lies. See SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S. Ct. 1575, 91 L.Ed. 1995 (1947); N.L.R. B. v. A.P.W. Products Co., 316 F.2d 899, 905-906 (2d Cir. 1963). Absence of general regulations and objective criteria regarding postulated accident situations, which the Licensing Board thought necessary before granting authorization to issue the license, presents no bar to the issuance of the license in this case since the Board's decision is amply supported by a full record. Just as an agency may reverse its hearing examiner, the Appeal Board, acting as the Commission itself in this case, may reverse the Licensing Board, especially on questions of policy and discretion.
 
 
 20
 The Appeal Board's actions were well within its powers when it conducted limited evidentiary hearings and ordered them held in Washington, D. C. As the Board said:
 
 
 21
 "Holding of a proceeding of this type is clearly within the Appeal Board's jurisdiction. The Administrative Procedure Act, which is specifically made applicable to proceedings of this type by Section 181 of the Atomic Energy Act of 1954, as amended, 42 U.S.C. Sec. 2231, contemplates that when an initial decision is subject to review within an agency, the reviewing body may 'restrict its decisions to questions of law, or to the question of whether the findings are supported by substantial evidence or the weight of evidence . . . [or] it may make entirely new findings either upon the record or upon new evidence which it takes.' . . . The authority vested in the Appeal Board includes the entire authority and review functions which would otherwise be exercised by the Commission in a given case. It follows that the Appeal Board has the Commission's authority, as contemplated under the Administrative Procedure Act, to take evidence incident to its appellate review . . . ." (Footnote omitted.)
 
 
 22
 10 C.F.R. Sec. 2.703(b) states that the time and place of hearing will be fixed "with due regard for the convenience of the parties or their representatives, the nature of the proceeding, and the public interest." This is obviously a guideline to the agency's discretionary authority. The Appeal Board did not abuse its discretion in determining that Washington, D.C., was the appropriate place to hold the additional hearings, especially in light of the fact that petitioner's only witness was from Pittsburgh, Pennsylvania and several of the witnesses representing the Commission's Regulatory Staff were from the Washington, D.C., area. Other witnesses were from Pennsylvania and California while only two were from New York.
 
 
 23
 Petition denied.
 
 OAKES, Circuit Judge (dissenting):
 
 24
 I respectfully dissent.
 
 
 25
 While there may have been an overreaction on the part of some to the threats from this "little" reactor, there are two points which seem to me to require reversal-the absence of AEC safety standards relating to teaching or research reactors and the absence of an Environmental Impact Statement (EIS) under NEPA.
 
 
 26
 Regarding safety standards, the AEC Safety and Licensing Board itself denied a license because it would not answer questions about the reactor's possible effect on public health and safety absent applicable substantive criteria and convincing objective standards concerning evaluation of possible nuclear accidents. 2 CCH Atom.En.L.Rep. p 11,595 (May 18, 1972). One must certainly agree with the Safety Licensing Board that the "fission products release fraction under postulated accident conditions for such a standard product as a Triga reactor ought to be a matter of proven determination and unquestionable validity." Moreover, apparently the regulatory staff of AEC has shifted the basis of its safety evaulation of accident conditions from one Triga case to another. The Appeal Board did not really disagree with the need for standard regulations-in fact it strongly recommended adoption of them-but went ahead and granted a license here anyway. While the petitioners' postulated accidents seem quite remote to me,[1] it may be that there is some other postulated accident that should be taken into account that was not in evidence in this proceeding, and a rule-making procedure would seem to be the preferable way to develop this. Through a rule-making procedure the Commission may "educate itself," cf. Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 482 (2d Cir. 1972); Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3rd Cir. 1969), and formulate all of the necessary standards and requirements based upon appropriate scientific data, and that would make it easier for everyone to know the Commission's regulations on an issue of substantial importance; apparently Triga and other teaching reactors are widely used and may be even more widely used in the future. Courts, I believe, have the power to remand for rule-making proceedings in cases of this type, where the agency obviously should have formulated a generalized policy but has failed to do so. Cf. Bell Aerospace Co. Division of Textron, Inc. v. NLRB, 475 F.2d 485, 494-496 (2d Cir. 1973) (Friendly, C. J.) (change in Labor Board's "managerial employees" exception to coverage of National Labor Relations Act made throught adjudication remanded to Board for rule-making proceeding).
 
 
 27
 A rule-making proceeding here is particularly appropriate for another reason -it might serve as a measure of protection against the agency's own interests influencing its disposition of this particular case. I have already mentioned the Commission's variable "standards" for licensing Triga reactors.
 
 
 28
 I continue[2] to express concern that the AEC is charged with the dual duty of passing on licenses on the one hand but promoting the use of atomic power on the other. The AEC also has an interest in seeing this reactor licensed to promote its Nuclear Education Training Program; to this end it has entered into an agreement with Columbia to provide post-license funds for the operation of the reactor and to waive charges for Commission-owned special nuclear material involved in its operation. My concern is so much the greater where, as here, the independent Safety and Licensing Board has denied the license, but was overruled by the three-member Appeal Board, consisting of two AEC staff members. Moreover, the safety tests relied upon by the Appeal Board here were conducted by the most interested party, the manufacturer of the reactor, following an exchange of correspondence between "Ralph" (Mr. Peters of Gulf Oil) and "Pete" (Dr. Peter A. Morris, Director of the AEC Division of Reactor Licensing) in which Gulf advised the Commission that "We hope to have you or members of your staff participate fully in these experiments so that they will be deemed to have been done 'under the auspices of the Regulatory Staff."' Following this Dr. Morris advised Gulf that he would attend the tests "as an observer." In holding that the FPC could not adopt as its own an EIS drawn up by a state agency-applicant for a power license this court said in Greene County Planning Board v. FPC, 455 F.2d 412, 420 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972): "The danger of this procedure [the one followed by the FPC], and [its] obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions." (Emphasis supplied.) While Greene County dealt with the requirements of NEPA I cannot believe that the AEC should be held to any lesser standard in its safety licensing procedures. The Commission should not be permitted to abdicate its responsibility for ensuring public safety to a party with a large financial stake in the outcome of the tests it is conducting. One good way to insure it does not do so is to require it to draw up safety standards generally applicable to all teaching reactors, not just to the one in this particular case.
 
 
 29
 With regard to the necessity for the preparation and filing of an EIS under NEPA, 42 U.S.C. Secs. 4321-4347 (1970), the threshold question is whether, or to what extent, the agency's own determination that a given agency action is not a "major Federal action significantly affecting the quality of the human environment," 42 U.S.C. Sec. 4332(2)(C), is binding upon us. This court has previously held in Hanly v. Kleindienst, 471 F.2d 823, 829 (2d Cir. 1972), that "the appropriate criterion . . . is the 'arbitrary, capricious' standard established by the Administrative Procedure Act, since the meaning of the term 'significantly' as used in Sec. 102(2)(C) of NEPA can be isolated as a question of law." The two relevant factors for consideration, Hanly v. Kleindienst went on to say, 471 F.2d at 830-831, were: "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." I do not think that it would be inconsistent with, or stretching, this language to say that the true first test is the extent to which the action has the potential of causing adverse environmental effects. Cf. Scientists Institute v. AEC, 481 F.2d 1079 (D.C.Cir., 1973) (NEPA requires EIS for AEC's breeder reactor program even though program is presently only in research and development stage in part because of potential future environmental effects of program). For Hanly articulated a threshold test, and if its questions are answered in the negative then an EIS, through which the full scope of the potential environmental effects of a "major Federal action" are actually brought out, would not be required. If the potential is substantial then the impact statement must be forthcoming; NEPA speaks of making an initial determination "as to whether the proposal would have a significant effect," not whether it "does have" such an effect.
 
 
 30
 By upholding the AEC's determination that there would not be any such significant potential effect here, the majority apparently adopts the "rational basis" standard of review rejected by the Hanly court. See 471 F.2d at 829. The effect of the majority's decision is to give the agencies a loophole big enough to make NEPA meaningless, or in Judge Skelly Wright's words a "paper tiger." See Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D. C. 33, 449 F.2d 1109, 1114 (1971). The potential effect of a nuclear accident on the environment of New York City would be pretty substantial, if not catastrophic, and even though the Safety and Licensing Board and the Appeal Board did not accept the petitioners' postulated accidents, they each considered safety standards that involved hypothetical "accidents." The fact that the former found there were no generalized standards and that the latter found that under the regulatory staff's postulated accident situation "the health and safety of the public will not be endangered" do not take away from the proposition that in the event of an accident the damage would be great. The fact that the Appeal Board in its decision did "not consider it desirable to use the standards of 10 CFR Part 20 for evaluating the effects of a postulated accident in a research reactor" even while it "strongly recommend[ed] that specific standards for the evaluation of an accident situation in a research reactor should be formulated" in and of itself indicates to me that there is here involved a sufficient "potential" of environmental effect to require an impact statement.
 
 
 31
 Moreover, ten pages of the Appeal Board decision is devoted to answering the testimony of appellant's expert, a Dr. Sternglass, relative to infant mortality rates in the vicinity of Triga reactors at Penn State College, the University of Illinois and in San Diego where the Gulf-General Atomic Corporation has its plant. It may be that Dr. Sternglass's determinations do not have any "valid scientific foundation," as the Appeal Board held. (I suppose that many thought that Rachel Carson's thoughts and fears expressed in Silent Spring had none either.) But does that mean that there is not a potential environmental effect that at least bears examination through the preparation of an EIS? I should suppose that even though this is a "little" research reactor its potential environmental impact is at least as significant as that of a federal jail, Hanly v. Kleindienst, supra, or the abandonment of a 1.8 mile stretch of railroad, City of New York v. United States, 337 F.Supp. 150, 158-160 (E.D. N.Y.1972) (three-judge court). See generally Developments in Environmental Law, 3 E.L.R. 50001, 50005 (1973). The finding here by the Commission that no impact statement is required in my view was arbitrary and capricious.
 
 
 32
 Were an impact statement to be required the AEC could not argue that the Appeal Board's decision amounted to one. This is so because (A) the Board relied quite heavily on data furnished by the manufacturer contrary to the requirements of Greene County Planning Board v. FPC, supra, and because (B) there has not been consultation with other concerned federal agencies such as EPA or HEW, as required by 42 U.S.C. Sec. 4332(C).
 
 
 33
 Because I think that the AEC did not meet the requirements of its own Act in reversing the Safety and Licensing Board and because I think enough potential environmental effect was demonstrated to require the preparation of an EIS, I dissent.
 
 
 
 [1]
 Petitioners' expert postulated three hypothetical accidents: (1) sabotage, causing the loss of shielding water plus rupturing of one of several fuel elements; (2) any circumstance causing a fuel element to reach 1000~ centigrade, followed by a rupture of the fuel elements in air; (3) an aircraft accident
 Even through sabotage at Columbia University is not exactly an unheard-of-event, there was substantial evidence that the juxtaposition of so many relatively sophisticated operations would apparently be required to make the sabotage effective that the "Mission Impossible" team would be required to effectuate it. There is some evidence to indicate that 1000~ centigrade cannot be attained in a Triga. While I cannot agree with the AEC view that it is a one in 10 billion chance that an airplane would accidentally strike the Columbia Triga, because I don't think such an event is susceptible to meaningful mathematical computation, there is some evidence. however, that it would take a vertically dropping plane penetrating four feet of earth, two feet of reinforced concrete and a steel beam crane at a specific time when fission product accumulation was high to create a possibility of serious radioactive release.
 
 
 [2]
 See Developments in Environmental Law, 3 E.L.R. 50001, 50008 (1973):
 . . . for the most part the agencies which must do the "full good faith" balancing of economic and social costs against environmental costs are generally structured to be advocates for economic expansion. As long as agencies are left to do the balancing, and as long as they have a dual mandate of environmental protection and economic development in their particular field-for example, power growth for the FPC, nuclear development for the AEC, or flood containment for the Army Corps of Engineers-is not the environment bound to come out on the short end?
 (Emphasis original.)