**TOWN OF ORANGETOWN,**
**Plaintiff-Appellant,**

**v.**

**Anne GORSUCH, Individually and as Administrator of the United States Environmental Protection Agency; Richard Dewling, Individually and as Regional Administrator of the United States Environmental Protection Agency; Rockland County Sewer District No. 1; County of Rockland; Town of Ramapo; Town of Clarkstown; and Robert Flacke, as Commissioner of the New York State Department of Environmental Conservation, Defendants-Appellees.**

**No. 1260, Docket 83–6035.**

United States Court of Appeals, Second Circuit.

Argued April 22, 1983.

Decided Sept. 21, 1983.

---

4. Only willful violations of the Securities and Exchange Act are criminally punishable. Section 32(a), 15 U.S.C. § 78ff.

David Sive, New York City (Laurence B. Jones, Winer Neuburger & Sive, P.C., New York City, of counsel), for plaintiff-appellant Town of Orangetown.

Peter A.A. Berle, New York City (Carol A. Buckler, Berle, Butzel, Kass & Case, New York City, of counsel), for defendants-appellees Rockland County Sewer Dist. No. 1, et al.

Gaines Gwathmey, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, U.S. Atty., S.D.N.Y.; Thomas D. Warren, Asst. U.S. Atty., S.D.N.Y.; Gary M. Rowen, Asst. Regional Counsel of U.S.E.P.A., New York City, of counsel), for defendant-appellee U.S. Environmental Protection Agency.

Mary Lyndon, Asst. Atty. Gen., for State of N.Y., New York City (Robert Abrams, Atty. Gen. for State of N.Y., New York City, of counsel), for defendant-appellee Flacke.

Vincent J. Aceste, Harrison, N.Y. (Alfred E. Page, Clune, White & Nelson, Harrison, N.Y., of counsel), for defendant-appellee Town of Clarkstown.

Before OAKES, PIERCE and PECK,* Circuit Judges.

PIERCE, Circuit Judge:

The Town of Orangetown appeals from a final judgment of the United States District Court for the Southern District of

* Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

New York, Richard Owen, *Judge,* 544 F.Supp. 105, dismissing plaintiff's challenge to the approval by the Environmental Protection Agency (EPA) of construction grants for the design and expansion of the Rockland County Sewer District No. 1 (RCSD) sewage treatment system, and for a portion of the construction costs of said expansion. At the heart of this appeal is the issue of the appropriate scope of judicial review of an administrative agency's decision-making process and the standard against which such decisions are to be measured.[1]

On appeal, Orangetown's principal contentions are: (1) that the EPA acted unlawfully in failing to prepare an Environmental Impact Statement (EIS) before providing funds for the expansion and design of the RCSD waste treatment system, (2) that the agency acted in violation of its regulations in administering the subject federal construction grant program, (3) that the district court erred in determining that operation of the RCSD plant did not constitute a nuisance and, (4) that the court erred in dismissing plaintiff's New York State Environmental Quality Review Act (SEQRA) claim as barred by the statute of limitations. For the reasons stated hereinbelow, we affirm the district court's dismissal of the complaint.

## FACTS

The proposed project against which this action is directed involves the expansion of the sewage treatment plant of the Rockland County Sewer District No. 1. The project entails the expansion of the plant's sewage collection system and the installation of modern odor-control equipment. The waste treatment plant presently services the Rockland County Sewer District No. 1 which covers approximately 80 square miles and provides sewage treatment for 160,000 residents in the Towns of Clarkstown and Ramapo and the Villages of Spring Valley and New Square. Sewage from the district is piped into and treated at the plant's main facility in the Town of Orangetown, New York. Although the County's treatment plant is situated in Orangetown, that town's sewage is treated in its own plant, which is located less than one mile from the County plant.

In recent years, it has become apparent that the RCSD plant is inadequate to meet the area's present and future needs. The already overtaxed plant has experienced several equipment breakdowns and has been allegedly associated with foul and noxious odors. After commissioning a number of waste treatment studies of the plant system, the sewer district sought to expand the capacity of the RCSD plant's sewage disposal system and related piping, modernize its equipment, and repair the present plant facilities.

The existing RCSD sewage treatment plant presently has a design capacity to treat 3,800 cubic meters (10 million gallons per day, or "10 mgd"), but present wastewater flows substantially exceed this quantity. A large part of the excessive flow at the plant is due to the infiltration of groundwater and the inflow of stormwater into the interceptor and collection system.[2]

---

1. For the convenience of the reader, the following abbreviations are set forth:

   CWA — Clean Water Act or Federal Water Pollution Control Act Amendments of 1972
   DEC — State Department of Environmental Conservation
   EA — Environmental Assessment
   EID — Environmental Information Document
   EIS — Environmental Impact Statement
   EPA — Environmental Protection Agency
   I/I — Infiltration and Inflow
   mgd — million gallons per day
   NEPA — National Environmental Policy Act of 1969

   RCSD — Rockland County Sewer District
   SEQRA — State Environmental Quality Review Act
   SSES — Sewer System Evaluation Survey

2. Infiltration refers to "[w]ater other than wastewater that enters a sewerage system (including sewer service connections) from the ground through such means as defective pipes, pipe joints, connections, or manholes."

   Inflow refers to "[w]ater other than wastewater that enters a sewerage system (including sewer service connections) from sources such as roof leaders, cellar drains, yard drains, area drains, foundation drains, drains from springs

As part of the project presently being proposed, the RCSD treatment plant will be expanded to 8,500 cu m (25 mgd) to handle existing and future sewage flows from the sewer district as well as the infiltration and inflow from groundwater and stormwater. The proposed sewerage system expansion will enable the RCSD to sewer presently unsewered areas of the RCSD, and relieve the burden on the present RCSD plant as well as on numerous smaller municipally and privately owned sewage treatment plants.

In 1976, pursuant to the EPA construction grant program, 40 C.F.R. § 35.900–35.970 (1982), the Town of Ramapo and the RCSD applied to the EPA for funding to initiate a planning process for the modernization and expansion of the RCSD waste treatment plant system.[3] The requests for funding were made pursuant to a three-step federal assistance program, the purpose of which is to assist municipalities in constructing waste treatment works. *Id.* § 35.903. Step I Funds pay the partial cost of generating a "Facilities Plan" which outlines the proposed project; Step II Funds pay the partial cost of designing the project; and Step III Funds help defray the costs of actual construction.

In response to the requests for funding, EPA made a grant of Step I Funding to the Town of Ramapo and the RCSD in 1976. During the next four years, a number of waste treatment studies or Sewer System Evaluation Surveys (SSES) were conducted

and a nine-volume Facilities Plan was prepared by the RCSD and the Town of Ramapo. During the development of the various drafts of the Facilities Plan, coordination and exchanges of information were made with consulting engineering firms directly through the RCSD or through various federal and state agencies. Other data used in the planning process were obtained from the Rockland County Planning Board, local municipalities, and surveys of the sewer district and sewer system previously sponsored by state and federal agencies. During the same period, the RCSD held public information meetings and a formal public hearing so that pertinent documentation could be presented for review by the public and various environmental groups.[4] Based on data derived at the information meetings and public hearing, adjustments to the planning were made. Still further input to the planning process was provided through frequent negotiations between the RCSD, the New York State Department of Environmental Conservation (State DEC) and the Regional Administrator of the EPA. Due to this interaction of parties, the Facilities Plan was the subject of numerous amendments, and other subsequent modifications were incorporated into the facility's design. The record shows exchanges of correspondence indicating that specific proposals were made to both the State DEC and EPA and were given careful consideration. For example, the initial location of the administration building was changed to anoth-

---

and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm waters, surface runoff, street wash waters, or drainage." 40 C.F.R. § 35.905.

3. Due to an already overburdened sewerage system, the Town of Ramapo proposes to retire its municipal sewerage facilities and construct a system of gravity and pressure sewer lines to feed into the RCSD system. In this way, the town will provide the sewerage services needed to sewer approximately one third of the town which is presently unsewered. Although the Town of Ramapo has submitted a separate construction grant application for state and federal funding, the town's proposal is a joint undertaking with the RCSD. For purposes of this opinion, the construction projects proposed by

the Town of Ramapo and the RCSD will be considered as one project.

4. The record reveals that RCSD conducted several public information meetings between February 14, 1978 and June 4, 1979 in various towns located within the district. Input was sought from the public, environmentalists and various agencies of the town governments within the sewer district. On January 28, 1980, RCSD conducted a formal public hearing. At the hearing, testimony was presented by eight speakers from the Sewer District, local legislators and local officials before the floor was opened for public discussion. Materials received from the public information meetings were incorporated into the facilities planning process.

er site to overcome environmental concerns about protecting wetlands. Also, a meeting held August 6, 1980, between the agencies and RCSD led to deletion of a rear access road from the Facilities Plan, while a proposal to build prefabricated ventilated buildings over the first stage of rotating biological disks was included in the Facilities Plan to minimize adverse environmental effects.

The Facilities Plan and related documents were submitted to the State DEC for its review and approval by late summer of 1980, and the State DEC, having worked in concert with the EPA and the applicants to conform the project to federal and state agency standards, certified the Facilities Plan to the Grants Administration Branch of the EPA on August 29, 1980.

Upon receipt of the Step II grant applications from the RCSD and Ramapo, the EPA performed an environmental review of the project. On the same date, the EPA issued a public statement which concluded that the agency had determined that "no significant impact will result from the proposed action." [5] Consequently, the agency determined not to prepare an Environmental Impact Statement (EIS) before granting construction funds for the project. Instead, the EPA attached to the public notice of "no significant impact," a thirty-four page Environmental Assessment (EA), which described the facilities planning area of the project, set forth the purpose of and need for the project, identified the selected plan and its costs, evaluated the environmental consequences of the various alternatives to expanding the present plant system and listed, *inter alia,* the projected effects on wetlands, floodplains, vegetation, and sedimentation. The EA also outlined the steps taken to minimize adverse environmental consequences and listed the Special Grant Conditions which would be attached to any federal construction grants in order to protect environmentally sensitive areas from development.

On September 30, 1980, the EPA offered a Step II design grant to the RCSD in the amount of $2,858,627 and to Ramapo in the amount of $505,950. The grants were accepted by both applicants in November, 1980. However, before the RCSD could apply for Step III construction funding, the Town of Orangetown commenced the instant action challenging the EPA's environmental processing of the applications. Plaintiff's amended complaint asserted five causes of action primarily seeking declaratory and injunctive relief. The first claim alleged that the environmental processing of the RCSD project violates the National Environmental Policy Act (NEPA); the second claim alleged that the award of Step II grants violates the Clean Water Act (CWA); the third claim alleged that the state and local defendants violated the SEQRA by unlawfully treating the project as excluded from the requirements of that Act; and the fourth and fifth claims sought injunctive and monetary relief for the improper operation of the County plant, which plaintiff alleged to be a nuisance.[6] In their answers, RCSD and Ramapo asserted counterclaims seeking injunctive and monetary relief and alleged that Orangetown's own sewerage treatment plant constituted the nuisance in the area.

At pretrial proceedings, the district court granted the State DEC's motion to dismiss the third (SEQRA) claim as barred under the applicable state statute of limitations.[7]

---

**5.** The EPA was able to issue its finding of no significant impact on the same day as the state certification because RCSD had already submitted its preliminary grant application for consideration pursuant to 40 C.F.R. § 35.920–2(b).

**6.** At the start of trial, Orangetown obtained leave to amend the complaint to allege a sixth cause of action which reflected the fact that during the pretrial proceedings, EPA awarded the project a Step III, Phase I grant. The sixth claim alleges the same violations as those alleged with respect to the Step II grants and claims that EPA's issuance of the Step III, Phase I grant violates NEPA and EPA's regulations.

**7.** At the completion of the plaintiff's case, the district court granted a similar motion by the County Defendants and dismissed the third cause of action in its entirety.

Trial on the nuisance issues and EPA's finding of no significant impact began on October 12 and continued until October 27, 1982. Upon completion of the plaintiff's case, the district court dismissed the fifth claim as against the County Defendants and EPA, and the fourth claim as against the State DEC and EPA for failure to state a claim upon which relief could be granted.[8]

On January 24 and 25, 1983, the district court issued findings of fact and conclusions of law on the NEPA, CWA and nuisance claims before dismissing the counterclaims and plaintiff's complaint in its entirety. Specifically, the court denied the relief sought after finding that, based upon the administrative record, the EPA had considered the relevant environmental factors in determining that the project would not have a significant impact on the environment. The court also concluded that EPA's action in approving the Step II and Step III, Phase I grants fully complied with NEPA and CWA provisions, as well as the EPA's construction grant regulations. In addressing the nuisance claims, the court found that the evidence presented did not support a finding that either plant constituted a public nuisance.

## DISCUSSION

■ On January 1, 1970, the National Environmental Policy Act was enacted to promote a national policy which would "encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321 (1976). To achieve this national policy, NEPA requires that federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" include in their proposals or recommendations an EIS which provides an assessment of the beneficial and adverse environmental impacts of the proposed action. *Id.* § 4332(2)(C). An EIS is evidence that an agency has considered the reasonably foreseeable environmental effects of a proposed major action before making a decision to take the action. However, no EIS is required where the major federal action is not "significant" within the meaning of NEPA. *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) ("Hanly II"); *Hanly v. Mitchell,* 460 F.2d 640, 644 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) ("Hanly I"). Essential to the outcome herein is the determination whether the EPA erred in deciding that providing partial funding for the modernization and expansion of the RCSD sewage treatment system will not "significantly" affect the quality of the human environment in Rockland County Sewer District No. 1 and, in particular, in the Town of Orangetown.

### Scope of Review

The issue of whether a particular agency's action will have a "significant" effect on the environment is a substantive issue which has traditionally been left to the informed discretion of the agency proposing the action or project. *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir.1983). *See also Scenic Hudson Preservation Conference v. Federal Power Commission,* 453 F.2d 463, 480 (2d Cir.1971) ("[T]he resolution of highly complex technological issues such as these was entrusted by Congress to the [agency] and not to the courts."), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972). NEPA does, however, provide a procedural framework within which substantive judgments must be made. The courts must ensure that agencies comply with the "procedural duties" mandated by NEPA, *Kleppe v. Sierra Club,* 427 U.S. 390, 406 & n. 15, 96 S.Ct. 2718, 2728 & n. 15, 49 L.Ed.2d 576 (1976), while still assuring compliance with the substantive purposes of that Act.

Orangetown argues that the EPA is required to prepare an EIS which would highlight what Orangetown perceives to be the

---

**8.** At the commencement of trial, and following plaintiff's opening statement, the district court dismissed plaintiff's nuisance claims against the Town of Clarkstown because plaintiff had failed to allege that Clarkstown had control over the operation of the County plant.

significant environmental impacts of that agency's decision to grant funds for the RCSD modernization and expansion project. Orangetown contends that the EPA has not adhered to the procedural framework dictated by NEPA, and that its finding of "no significant impact" was arbitrary and capricious.

EPA's determination of "no significant impact" is neither a rulemaking nor an adjudicatory function, but rather a factual finding made by an agency with particular expertise in environmental matters. The appropriate scope of review is therefore prescribed by the Administrative Procedure Act (APA), which provides that agency action may be overruled by a court only if the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); City of New York v. United States Department of Transportation, 715 F.2d 732, at 748 (2d Cir.1983); Cross-Sound Ferry Service, Inc. v. United States, 573 F.2d 725, 729 (2d Cir.1978); Hanly II, 471 F.2d at 828–29.

In Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam), the Supreme Court addressed the question of the scope of review of agency decisions on environmental issues. Although the holding of the case is limited to the question of whether NEPA requires the agencies to elevate environmental concerns over other legitimate concerns, the Court quoted from Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), in finding that, under NEPA, the judicially reviewable duties that are imposed on agencies are "essentially procedural," and that "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences." 444 U.S. at 227, 100 S.Ct. at 499. The court cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." Kleppe v. Sierra Club, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (quoting Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 838 (D.C. Cir.1972)).

Recognizing the limits of our review herein, we understand the "procedural" requirements of NEPA to be the guidelines with which this court must assess the kinds of relevant environmental factors that must be weighed. We must, therefore, look to see whether the environmental impact assessment contains the type of reasoned elaboration required to support the agency's determination of no significant impact. In short, the appropriate role of the court is to ensure that EPA has taken a "hard look" at the environmental consequences which are likely to result from the RCSD modernization and expansion program, to be attuned to whether the EPA has considered the relevant areas of environmental concerns, and to assess whether the agency has convincingly documented its determination of "no significant impact." See, e.g., Maryland-National Capital Park & Planning Commission v. U.S. Postal Service, 487 F.2d 1029, 1040 (D.C.Cir.1973).

## I. Finding of No Significant Impact

Orangetown contends that an EIS should have been prepared by EPA because of specific impacts which it believes federal funding will have in causing a significant effect on the environment. It claims that the EPA's failure to assess, or in some instances, to more adequately assess, these impacts constituted an abuse of discretion. Specifically, Orangetown points to several matters which it claims were not given adequate consideration by the EPA: the project's impact on wetlands, floodplains, and land use; the project's alleged inadequate design; and consideration of the controversial nature of the project. These claims will be examined seriatim.

### A. Wetlands

Orangetown claims that the sewage treatment plant modernization and expan-

sion project will have a "significant adverse effect" on wetlands and floodplains in the area of the plant expansion and along the system of piping where new interceptors and collector sewers will be placed. In support of its contention that an EIS is required, Orangetown cites the EPA's own Review Procedures for Wastewater Treatment Construction Grants Program, 40 C.F.R. § 6.506(a)(2), which requires the responsible official of the EPA to ensure that an EIS will be issued when "[t]he treatment works or collector system will have significant adverse effects on wetlands, including indirect effects, *or any major part of the treatment works will be located on wetlands." Id.* (emphasis added). Orangetown contends that the administrative record contains no reference to the fact that a major part of the new construction for the project, including the grit tanks and chambers, digested sludge storage, sludge and grit handling buildings, new primary settling tanks and pumping stations, will be on land which appellant's expert claims to be wetlands.

However, the proposed area to be affected by construction of the plant expansion has not been designated as a "wetlands" area by the EPA. 40 C.F.R. Part 6 App. A § 6(a)(1) provides in relevant part:

(1) *Floodplain/Wetlands Determination*—Before undertaking an Agency action, each program office must determine whether or not the action will be located in or affect a floodplain or wetlands. The Agency shall utilize maps prepared by the Federal Insurance Administration . . . Fish and Wildlife Service . . . *and other appropriate agencies* to determine whether a proposed action is located in or will likely affect a floodplain or wetlands.

*Id.* (emphasis added). Under New York State law, the State DEC is the responsible "agency" for the supervision and protection of wetlands and is charged with preparing detailed maps of wetlands as part of this responsibility. *See* 6 N.Y.C.R.R. §§ 664.1, 664.7 (1980). As the Facilities Plan indicates, the State DEC has not designated the affected area as a "wetlands." Thus, the EPA did not err in not issuing an EIS since

a major part of the proposed addition to the RCSD treatment works will not be located on "wetlands" as defined by an appropriate federal or state agency.

Orangetown contends that regardless of whether the State DEC has designated the area to be a wetlands, the proposed area, populated with reeds, flooded shrubs and wooded live deciduous trees, is nonetheless a wetlands area. Orangetown further suggests that the State DEC has not designated the area as a wetlands because the affected area will be less than 12.4 acres and has not been defined as an area of "unusual local importance," both factors to be considered by the State DEC in designating areas as wetlands. *See* 6 *Id.* §§ 662.2(a), 662.4(b) (1976). However, our review of the administrative record reveals that the EPA was notified in the Facilities Plan of the "wetlands species" in the area, as well as of the relatively small size of the affected area. *See* EPA exh. D4, VII–2. Under these circumstances, and in light of the fact that the State DEC has not found the area to be of "unusual local importance," and did not designate the area as a wetlands, EPA cannot be faulted for failing to issue an EIS solely because of the wetlands effect.

We note that the Facilities Plan also indicates that a substantial area surrounding the plant has already been "disturbed" by the existing RCSD plant. As this court stated in *Hanly II,* while both the absolute and comparative effects of an agency's actions must be evaluated, it must be recognized that "[w]here conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change. . . . One more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless public park." 471 F.2d at 831. Moreover, the administrative record herein indicates that principally, new interceptors were routed to follow existing rights of way and are to be placed along routes already disturbed by roadways or existing piping. *See, e.g.,* EPA exh. D3, Plates V–12, V–13. In this way, the project was

designed to minimize the wetlands impact due to expansion of the sewerage system.

Finally, the record reveals that the RCSD redesigned the plant's specifications to comply with the EPA's insistence on reducing wetlands impacts. *See* Memorandum of EPA Life Scientist Peter Gruber, May 27, 1980, EPA exh. D36; *see also* EA at 9, Plaintiff's exh. 4. In short, EPA specifically analyzed the wetlands impact of the entire project, and then determined that the wetlands affected would not be significant enough to mandate preparation of an EIS. We do not find this to be an arbitrary or capricious decision.

### B. Floodplains

Orangetown contends that no consideration was given by EPA to encroachment of the county plant on a nearby floodway, and that pursuant to 40 C.F.R. § 6.506(a)(4), issuance of an EIS was required. That section provides that an EIS is required where implementation of a project may directly cause or induce changes that significantly "[a]dversely affect a floodplain." This argument is devoid of merit. The EPA administrative record reveals that the actual encroachment on the floodway involves only a small portion of two buildings. *See* EPA exh. D6. It would be difficult to conclude that this *de minimis* intrusion onto the floodway could "significantly adversely affect a floodplain." The EA also indicates that EPA considered the project's effect on floodplains, and noted with approval RCSD's efforts to route the interceptors and collectors in such a way as to avoid nearby floodplains. *See* EA at 8, Plaintiff's exh. 4. These circumstances do not suggest that EPA ignored the project's effect on floodplains and wetlands, or that the EPA abused its discretion by determining that the wetlands and floodplains impact of this project did not warrant preparation of an EIS. *See Parsippany-Troy Hills v. Costle,* 503 F.Supp. 314 (D.N.J.1979), *aff'd mem.,* 639 F.2d 776 (3d Cir.1980).

### C. Land Use Impacts

Orangetown argues further that the land use impacts of the project are so significant that an EIS should have been prepared. EPA's regulations require that an EIS be issued if the treatment works will "induce significant changes ... in ... residential land use concentration and distribution." 40 C.F.R. § 6.506(a)(1). Apparently, Orangetown contends that expansion of the RCSD sewage treatment plant will *automatically* provide pressure for development in what is now undeveloped lands in the Town of Ramapo. Appellant's assertion lacks a substantial basis in the record and does not provide a ground to require the issuance of an EIS.

The Facilities Plan reviewed by the EPA defined in detail the scope of the project within the constraints of existing zoning regulations and contains zoning maps for the communities affected by either the plant expansion or the routing of interceptors, collectors and pipes. The Facilities Plan also contains a review of the demographic characteristics of the affected area and projected anticipated growth of the communities. Based on this information, the EPA found that the project was designed only to meet population growth expected to occur in the sewer district, and noted in the EA that sewers were to be installed only in places where development was already taking place or was anticipated. The EA states that:

> [t]he population of the planning area is projected to increase from approximately 160,000 to 201,000 over the 20 year design period of the proposed sewerage facilities. The population projections are based on recent development plans, zoning, and a constraints analysis which excluded environmentally sensitive areas (such as wetlands, floodplains, agricultural lands and step [sic] slopes) from development.

EA at 2, Plaintiff's exh. 4. Based on the available information, the EPA concluded in the EA that although the project "may" cause an increase in the rate of development, such an increase was not sufficiently significant to require the preparation of an EIS.

Appellant has not established that expansion of the sewage treatment system will encourage a significant increase in development rather than merely meet the district's presently overburdened needs and anticipated growth. It is possible that Orangetown's position would have been stronger had it established at trial that the projected capacity of the new sewage collection system greatly exceeded the required capacity for anticipated growth. Appellant might then argue that grossly excessive capacity would be an inducement to developers to utilize the undeveloped lands and to tap into the collection system. In light of the lack of sufficient evidence to indicate that there would be excessive capacity under the approved plan, and that the plant expansion would have the effect of inducing a significant change in land development, EPA did not abuse its discretion in not issuing an EIS. *See City of New York v. United States Department of Transportation,* 715 F. 2d at 746 n. 14 ("The fact that effects are only a possibility does not insulate the proposed action from consideration under NEPA, but it does accord an agency some latitude in determining whether the risk is sufficient to require preparation of an EIS."); *See also Township of Parsippany-Troy Hills v. Costle,* 503 F.Supp. at 324.

### D. Sewage Treatment Plant Design

Orangetown argues that the capacity of pipes carrying effluent to the sewage treatment plant (inflow) and the capacity of the discharge pipe which carries treated effluent from the plant to the Hudson River (outflow) are insufficient, and that this state of affairs will cause raw sewage to spew into the streets and streams of Orangetown. This alleged miscalculation has been criticized by appellant as further proof that EPA's finding of no significant impact was arbitrary and capricious. However, both claims are without merit.

The Facilities Plan contemplates peak flow through the plant of 53 mgd by the year 2000. However, an interim SSES study commissioned by the RCSD, and completed before issuance of the finding of no significant impact, estimated that the maximum influent in the year 2000 could reach 54.6 to 57.6 mgd. As the Facilities Plan explains, the estimated amount of a sewer pipe flow is composed of numerous variables including projected elimination of infiltration and inflow, demographic patterns and the constantly changing ways in which a community uses its water. Under these circumstances, EPA's utilization of the 53 mgd figure at the Facilities Planning stage cannot be said to be arbitrary given the relatively small difference between the two estimates of maximum flow in the year 2000 (53 mgd as against 54.6–57.6 mgd, or 2.6% to 8.7% variance).

With regard to the outfall pipe, Orangetown contends that the 102 mgd capacity of the outfall pipe, which is shared by the Orangetown and RCSD plants, is insufficient. However, examination of the administrative record and testimony at trial reveals appellant's argument to be a non-issue.

The Facilities Plan states that the joint outfall pipe has a capacity of 102 mgd. By contract, 42 mgd is allotted to the Orangetown plant and 60 mgd to RCSD. As Orangetown correctly states, a 1982 study commissioned by RCSD estimates that projected flow in the year 2030 could, under certain circumstances, exceed the outfall pipe's capacity of 102 mgd, and could reach as high as 104 mgd. However, this state of affairs seems unlikely to occur since the record reveals that Orangetown's total plant overflow is currently 6.95 mgd, and the projection for maximum outflow is 15.5 to 17 mgd in the year 2000. Without a significant expansion of Orangetown's own sewage treatment plant, the outflow pipe will not reach its designed capacity. Moreover, an expert in wastewater flow whose firm conducted the 1982 study testified at trial that, based on the projected flows from the Orangetown plant, there was no possibility of excess flow until at least the year 2030. Under these circumstances, we do not find that EPA acted arbitrarily in concluding that the project's design would not significantly affect the environment.

### E. Public Controversy

Orangetown argues that an EIS is required because of local opposition to the plant expansion project. Opposition and a high degree of controversy, however, are not synonymous. It is to be expected that expansion of an unpopular sewage treatment plan would generate a considerable degree of opposition; however, the term "highly controversial" as found in 40 C.F.R. § 1508.27(b)(4) (which outlines factors to be assessed in determining the "intensity" of a project, including "[t]he degree to which the effects on the quality of the human environment is likely to be highly controversial") refers to instances where "a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use." *Hanly II,* 471 F.2d at 830. To hold otherwise "would require an impact statement whenever a threshold determination dispensing with one is likely to face a court challenge [and would] surrender the determination to opponents of a federal action, no matter whether [the project is] major or not, nor how insignificant its environmental effects might be." *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973); *see also Hanly II,* 471 F.2d at 830 n. 9A; *Fund for Animals v. Frizzell,* 530 F.2d 982, 988–89 n. 14 (D.C. Cir.1975). In light of the evidence herein supporting a finding of no significant impact, something more than the mere speculation that the plant expansion will increase odor problems, rather than alleviate such existing problems, is necessary before a project can be called "highly controversial." The record lacks a sufficient basis to indicate that the opposition to this project was of such an extraordinary nature as to require an EIS.

Upon examination of the administrative record relied upon by the EPA, and that agency's findings as published in the EA, we find that the EPA considered the relevant data, investigated the relevant environmental concerns, and concisely documented the evidence supporting its conclusion that funding for the RCSD system expansion would not have a significant effect on the environment. Since the challenged findings are supported by substantial evidence, are not arbitrary and capricious, and do not represent an abuse of discretion, it is not within the competence of this court to overrule the agency's determination. *See City of New York v. United States Department of Transportation,* 715 F. 2d at 745, 748; *Morningside Renewal Council, Inc. v. United States Atomic Energy Commission,* 482 F.2d 234, 238 (2d Cir.1973); *Scenic Hudson Preservation Conference v. Federal Power Commission,* 453 F.2d 463, 468 (2d Cir.1971), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

### II. *Procedural Compliance With Construction Grant Program*

Orangetown next contends that EPA violated its regulations governing the construction grant program by omitting certain procedural steps and by not requiring compliance with the procedural aspects of the program prior to issuance of the Step II and Step III, Phase I grants. Upon careful examination of the record, we find that RCSD, as grantee, complied with the "public participation" requirements of 40 C.F.R. § 35.917–5 (1977) by holding timely public information meetings and a formal hearing; that the public had adequate opportunity to participate in the planning process; that the Facilities Plan was submitted to the State DEC, and that the State certified the Facilities Plan prior to submitting the Plan to the EPA pursuant to 40 C.F.R. §§ 35.917–7, 35.917–8; that the EA contains a wetlands/floodplains assessment; that since the Facilities Plan was commenced prior to December 15, 1979, an Environmental Information Document (EID) was not required to be prepared;[9] that the Facilities Plan had been approved by the EPA prior to the grant of Step II Funds; that the Step II grant applications from RCSD and the Town of Ramapo were filed with the EPA; and that the EPA reviewed these applications and awarded Step II Funds to the applicants.

---

**9.** *See* 40 C.F.R. § 6.102(c)(2).

Orangetown contends that EPA failed to assess and make specific findings required by 40 C.F.R. §§ 35.925–1 through 35.925–21.[10] These sections set forth a series of conditions that EPA must find to exist prior to the award of a grant under the construction grants program for sewage treatment works. We note, however, that while a clear and concise document outlining *seriatim* the agency's response to the demands of Section 35.925 would be of considerable assistance to a court's review of EPA's actions, the regulations do not require that the agency's actions be set down in any particular order or form, or even that its determinations be made in writing. All that is necessary is that a reviewing court be able to trace from the written record the path followed by the agency in deciding to take a particular action. *See generally Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). Our review of the EPA administrative record supports the district court's finding that "[t]aken as a totality the administrative record reflects that the objectives of 40 C.F.R. § 35.925 were accomplished and [that] therefore EPA complied with its terms."

### III. *Nuisance Claim*

Orangetown claims that the district court committed clear error in dismissing its public nuisance claim against the County defendants. We find the district court correctly dismissed appellant's nuisance claim.

Orangetown alleged at trial that operation of the County plant constituted a nuisance by virtue of its frequent equipment failures, which allegedly caused foul and noxious odors to permeate the air. After conducting a non-jury trial, the district judge concluded that *both* the Town and County waste treatment plants had generated offensive odors. Since the two plants are situated within 1800 feet of each other, the district judge found he could not conclude that the odors emanating from one plant alone created a "significant and unreasonable interference with public rights." *See, e.g., Copart Industries, Inc. v. Consolidated Edison Co.,* 41 N.Y.2d 564, 362 N.E.2d 968, 394 N.Y.S.2d 169 (1977); *New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 85 N.E.2d 873 (1949).

Both parties offered evidence at trial from lay and expert witnesses that the other party's waste treatment plant was poorly operated and emitted foul odors. Further, several witnesses testified that they were not prepared to identify which of the plants was the source of the odors they had experienced. The district court credited this testimony and concluded that it could not make an unequivocal finding of causation. Therefore, the district judge dismissed plaintiff's nuisance claim. From our review of the evidence presented at trial, we find no basis for overturning the district court's ruling that Orangetown's evidence, taken as a whole, failed to prove by

---

10. Only three of the 21 determinations were contested in the district court. Plaintiff's amended complaint only challenged compliance with subdivisions 35.925–7 ("Design"), 35.925–8 ("Environmental Review"), and 35.-925–13 ("Sewage Collection System"), as determinations which the Regional Administrator had failed to properly address prior to an award of construction grant funds. These three issues were among Orangetown's claims as the action proceeded to trial. More than two months after completion of the trial, on January 6, 1983, Orangetown moved pursuant to Fed.R.Civ.P. 15(b) to conform its pleadings to the proof adduced at trial to place in issue the claim that EPA "did not make the determinations required by 40 C.F.R. § 35.925." On January 24, 1983, the district court denied the

motion. Since inclusion of the 17 remaining determinations of Section 35.925 were not tried by the parties' express or implied consent, and were not presented in such a way that the defendants could fairly "defend ... [and] offer any additional evidence if the case were to be retried on a different theory," *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977) (quoting 3 Moore's *Federal Practice* ¶ 15.13[2], at 993 (2d ed. 1966)), we find the district court did not abuse its broad discretion in denying the motion. "The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record." *Browning,* 560 F.2d at 1086.

a preponderance that the county plant operation resulted in a public nuisance.

## IV. *SEQRA Claim*

Orangetown contends that the district court erred in dismissing its third cause of action which sought to enjoin the State DEC from granting the state portion of construction funding for the RCSD sewage treatment plant expansion. Appellant's third cause of action alleges that the State DEC did not comply with the requirements of SEQRA by granting state funds and certifying the project for federal funding, without requiring that an EIS be prepared.

■ The district court found that Orangetown's SEQRA challenge was a claim against a New York State agency and thus was governed by the statute of limitations as set forth in N.Y.Civ.Prac.Law § 217 (McKinney 1972).[11] The court dismissed the SEQRA claim against the State DEC on July 26, 1982, and wrote:

> Plaintiff's third claim for relief raises a state law issue. Where state created rights are being contested, the limitations ·period is governed by state statute. *See, e.g., Guaranty Trust Co. v. York,* 326 U.S. 99 [65 S.Ct. 1464, 89 L.Ed. 2079] (1945). In this instance, the appropriate statute is section 217 of the New York Civil Procedure Laws and Rules which allows that proceedings against a state officer must be commenced "within four months after the determination to be reviewed becomes final and binding. . . . "

On September 11 and 12, 1980, the state defendants submitted and certified the application attendant to the Orangetown plant to the Grants Administration Branch of the EPA. That activity concluded the state defendant's obligations pursuant to SEQRA, and the commence-

ment of the action in February, 1981, was beyond the statute of limitations. The claim is therefore barred. *Reisel, Inc. v. Exxon Corp.* [42 A.D.2d 500], 349 N.Y. S.2d 14, 20 (2d Dept.1973), *aff'd,* 36 N.Y.2d 888 [372 N.Y.S.2d 644, 334 N.E.2d 594] (1975).

Because we find the determination of the district court to be correct, we affirm the dismissal of appellant's third cause of action against the State DEC.

Appellant's complaint, filed February 26, 1981, was filed approximately five months after the State DEC's approval of RCSD's Step II grant application. Orangetown argues, however, that its late filing should be no bar since a challenge to a SEQRA determination is not reviewable under a CPLR Article 78 proceeding. Appellant further contends that the district court misinterpreted its third cause of action, which it alleges is actually a claim for injunctive and declaratory relief, and that thus, a six-year statute of limitation should be applied. This argument is without foundation or merit.

CPLR Section 217, or Article 78 proceedings, are applicable to final state determinations under SEQRA. *See, e.g., In re Town of Yorktown v. New York State Department of Mental Hygiene,* 92 A.D.2d 897, 459 N.Y.S.2d 891 (2d Dept.1983); *In re State of New York Northeastern Queens Nature and Historical Preserve Commission v. Flacke,* 89 A.D.2d 928, 453 N.Y.S.2d 773 (2d Dept.1981). Therefore, Orangetown's challenge to the State DEC certification was required to be made within four months of that agency's final determination.

■ Orangetown also errs in assuming that it can avoid the applicable bar by label-

---

11. N.Y.Civ.Prac.Law § 217 provides:
Unless a shorter time is provided in the law authorizing the proceeding, *a proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding* upon the petitioner or the person whom he represents in law or in fact, or after the respondent's refusal, upon the demand of the peti-

tioner or the person whom he represents, to perform its duty; or with leave of the court where the petitioner or the person whom he represents, at the time such determination became final and binding upon him or at the time of such refusal, was under a disability specified in section 208, within two years after such time.
(emphasis added).

ing its action as one seeking declaratory or injunctive relief. New York law requires its courts to look to the substance of a claim to determine which statute of limitations applies. If this examination reveals that a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern. *See Press v. County of Monroe,* 50 N.Y.2d 695, 409 N.E.2d 870, 431 N.Y.S.2d 394 (1980); *Solnick v. Whalen,* 49 N.Y.2d 224, 401 N.E.2d 190, 425 N.Y.S.2d 68 (1980). Therefore, we find appellant has not complied with the applicable specific four month statute of limitations period provided in N.Y.Civ.Prac.Law § 217, and we affirm the district court's dismissal of the third cause of action accordingly.

The judgment is affirmed in all respects. Each party shall bear its own costs.