**ALLEGHENY ELECTRIC COOPERATIVE, INC., Vermont Department of Public Service, New York City Public Utility Service, County of Westchester Public Utility Service Agency, Upstate Public Utility Services Association, James E. O'Neil, Attorney General of the State of Rhode Island and the Rhode Island Public Utilities Commission, Connecticut Municipal Electric Energy Cooperative and Massachusetts Municipal Wholesale Electric Company, Power Authority of the State of New York, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Allegheny Electric Cooperative, Inc., Municipal Electric Utilities Association of New York State, Public Power Association of New Jersey, New York State Electric & Gas Corporation, City of Cleveland, Ohio, Public Service Electric & Gas Company, City of New York, Port Authority of New York and New Jersey, Connecticut Municipal Electric Energy Cooperative and Massachusetts Municipal Wholesale Electric Company, Intervenors.

Nos. 369–376, Dockets 89–4125, 90–4067, 90–4069, 90–4071, 90–4073, 90–4075, 90–4077 and 90–4079.

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1990.

Decided Dec. 17, 1990.

thority of the State of N.Y., County of Westchester Public Utility Service Agency.

Scott H. Strauss, Washington, D.C. (David R. Straus, Spiegel & McDiarmid, Richmond F. Allan, Robert Weinberg, Duncan, Weinberg, Miller & Pembroke, Washington, D.C., of counsel), for petitioners Connecticut Mun. Electric Energy Co-op., Massachusetts Mun. Wholesale Elec. Co. and Allegheny Elec. Co-op., Inc.

Sheldon Whitehouse, Asst. Atty. Gen., State of R.I., Providence, R.I., for petitioners James E. O'Neil, Atty. Gen. of the State of R.I. and Rhode Island Public Utilities Com'n.

Robert H. Solomon, F.E.R.C. (William S. Scherman, Gen. Counsel, Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., of counsel), for respondent F.E.R.C.

Wallace L. Duncan, Washington, D.C. (Jeffrey C. Genzer, Richmond F. Allan, Robert Weinberg, Duncan, Weinberg, Miller & Pembroke, Washington, D.C., Reuben Goldberg, Channing D. Strother, Jr., Goldberg, Fieldman & Letham, Washington, D.C., Craig S. Miller, June W. Weiner, William M. Ondrey Gruber, Cleveland, Ohio, David R. Straus, Scott H. Strauss, Spiegel & McDiarmid, Washington, D.C., Kirk Howard Betts, Dickinson, Wright, Moon, Van Dusen & Freeman, Washington, D.C., Richard V. Hollyer, Dolan & Dolan, Newton, N.J., of counsel), for intervenors Mun. Elec. Utilities Ass'n of New York State, Allegheny Elec. Co-op., Inc., City of Cleveland, Connecticut Mun. Elec. Energy Co-op., Massachusetts Mun. Wholesale Elec. Co. and Public Power Ass'n of New Jersey.

Before MESKILL and ALTIMARI, Circuit Judges, and CONNER,* District Judge.

MESKILL, Circuit Judge:

Nine petitioners seek review of two orders of the Federal Energy Regulatory Commission ("FERC" or "Commission"). These petitions for review result from

Harvey L. Reiter, Washington, D.C. (William I. Harkaway, McCarthy, Sweeney & Harkaway, Washington, D.C., Victor A. Kovner, Corp. Counsel, New York City, Gail Rubin, Asst. Corp. Counsel, New York City, Howard J. Read, Read & Laniado, Albany, N.Y., Charles M. Pratt, Gen. Counsel, Arthur T. Cambouris, Wendy M. Lane, Power Authority of the State of N.Y., New York City, Barry R. Fischer, Howard A. Gootkin, Hall, Dickler, Lawler, Kent & Friedman, New York City, Marilyn J. Slaaten, County Atty., Michael Diederich, Jr., White Plains, N.Y., of counsel), for petitioners Vermont Dept. of Public Service, New York City Public Utility Service, Upstate Public Utility Services Ass'n, Power Au-

---

* Honorable William C. Conner, United States District Judge for the Southern District of New York, sitting by designation.

FERC's decision to affirm the findings and conclusions of an Administrative Law Judge (ALJ) concerning the Power Authority of the State of New York's (PASNY) allocation of hydroelectric power produced by the Niagara Power Project (Niagara Project) and FERC's decision to deny rehearing. *Opinion No. 329; Opinion Affirming Initial Decision,* 48 FERC ¶ 61,124 (July 28, 1989); *Order Denying Rehearing,* 49 FERC ¶ 61,068 (October 19, 1989). Niagara Project power is allocated in accordance with the terms of the Niagara Redevelopment Act (NRA), 16 U.S.C. § 836 *et seq.* The NRA mandates that PASNY, the licensee authorized to operate the Niagara Project, "give preference and priority to public bodies and nonprofit cooperatives within economic transmission distance" when allocating at least fifty percent of Niagara generated power. 16 U.S.C. § 836(b)(1). The Commission's interpretation of the language of this authorization provides the basis for this appeal.

The petitioners are divided into two groups. The first group of petitioners challenges FERC's holding that in order to qualify as a "public body" a public utility must (1) provide "yardstick competition" for private investor owned utilities (IOUs), (2) be directly responsible for meeting the requirements, and responding to the concerns, of its retail customers, and (3) have control of the electrical distribution system. This group consists of Vermont Department of Public Service (VDPS), PASNY, James E. O'Neil (as Attorney General for the State of Rhode Island), and the New York Municipal Distribution Agencies (MDAs)—consisting of New York City Public Utility Service (NYCPUS), County of Westchester Public Utility Service Agency (CWPUSA), and Upstate Public Utility Services Association (UPUSA). Petitioners VDPS and the MDAs also challenge the Commission's application of the "public body" criteria to them.

The second group of petitioners challenges the remedy chosen by FERC to address PASNY's violations of the terms of the NRA as well as its license. This group consists of Allegheny Electric Cooperative, Inc. (Allegheny), Connecticut Municipal Electric Energy Cooperative (CMEEC), and Massachusetts Municipal Wholesale Electric Company (MMWEC). Both groups of petitioners challenge the Commission's October 29, 1989 order denying a rehearing. The Municipal Electric Utilities Association of New York State (MEUA), and the remaining intervenors herein, support the Commission in all respects. We deny the petitions for review.

## BACKGROUND

The NRA authorized and directed the Commission to issue a license under the Federal Power Act, 16 U.S.C. § 791a *et seq.,* to PASNY for the construction and operation of a hydroelectric power project with the capacity to utilize completely the United States' rights to the water of the Niagara River. 16 U.S.C. § 836(a). PASNY is a political subdivision of New York State and is responsible for the hydroelectric development of the Niagara and St. Lawrence Rivers. The NRA further directed the Commission to impose the following as a condition of PASNY's license:

> In order to assure that at least 50 per centum of the project power shall be available for sale and distribution primarily for the benefit of the people as consumers, particularly domestic and rural consumers, to whom such power shall be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use, the licensee in disposing of 50 per centum of the project power shall give preference and priority to public bodies and nonprofit cooperatives within economic transmission distance.

16 U.S.C. § 836(b)(1). The fifty percent of Niagara Project power set aside for "public bodies and nonprofit cooperatives" is referred to as preference power. Those entities eligible to receive an allocation of this preference power are called "preference customers." To be a preference customer, an entity first must qualify as a "public body." The Commission's interpretation of the statutory term "public bodies" and its application of this "public body" criteria to

the MDAs and VDPS are the fundamental issues we must address.

The Commission, pursuant to its congressionally delegated regulatory authority under the Federal Power Act, 16 U.S.C. § 791a *et seq.*, has the responsibility to enforce the mandates of the NRA and the conditions of PASNY's license. Through the years, FERC has been called on to examine PASNY's compliance with the terms of the NRA and the conditions of its license.

In administering the NRA, FERC has necessarily interpreted and applied the statute's provisions. Specifically, over the past decade, the Commission has given content to the statutory term "public bodies" and the courts have had the opportunity to review the Commission's construction. Indeed, we have previously reviewed issues directly related to those presented here. *See Metropolitan Transp. Auth. v. FERC,* 796 F.2d 584 (2d Cir.1986) (*MTA*), *cert. denied sub nom. Allegheny Elec. Coop., Inc. v. FERC,* 479 U.S. 1085, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987); *Power Auth. of State of New York v. FERC,* 743 F.2d 93 (2d Cir.1984) (*PASNY*). Our holdings in these cases are particularly relevant to the issues presently being raised by petitioners.

A. *Prior Circuit Precedent*

In *PASNY,* we reviewed orders of the Commission regarding the proper allocation of Niagara Project hydropower to preference customers. We discussed in detail the historical background of the Niagara Project and examined the "agonizingly long" legislative history of the NRA. *PASNY,* 743 F.2d at 98–99, 104–106. In concluding that the Commission had properly applied the preference provisions of the NRA, we held that the NRA imposed no restrictions on the type of consumer—domestic or industrial—to which preference power could be sold at retail and that in adopting the NRA Congress intended to incorporate the principle of "yardstick competition." *Id.* at 105. This principle "assumes that if the municipal entities [that distribute power at retail] (as distinguished

from the end-users) are supplied with cheap hydropower their lower competitive rates will force the private utilities in turn to reduce their rates, with resulting benefits to all." *Id.*

In *MTA,* we were called on once again to review Commission orders dealing directly with the allocation of NRA preference power. *See Opinion No. 229; Declaratory Opinion and Order Affirming With Modifications Initial Decision on Niagara Preference Power for States Neighboring New York,* 30 FERC ¶ 61,323 (Mar. 27, 1985) (*Opinion 229*); *Opinion No. 229–A; Opinion and Order on Rehearing Clarifying Declaratory Opinion in Part, and Granting Petitions to Intervene Out of Time,* 32 FERC ¶ 61,194 (July 30, 1985) (*Opinion 229–A*). The issues presented in *MTA* arose from a dispute involving many of the parties presently before us and concerned the extent to which the NRA required PASNY to allocate preference power to out-of-state public entities. The Commission found that PASNY had improperly allocated preference power to in-state entities such as the Metropolitan Transportation Authority (MTA), thereby reducing the percentage of preference power available for allocation to eligible out-of-state entities. The Commission concluded that the statutory term "public bodies" meant governmental entities that sell and distribute preference power to consumers. *MTA,* 796 F.2d at 592. Because MTA utilized its preference power directly (*i.e.,* an end-user) and did not distribute it to consumers, the Commission found MTA ineligible for the receipt of preference power.

In addition to the issues involving MTA, the legality of an allocation of Niagara power to VDPS was also before the Commission. At that time, VDPS received its allocation of preference power and then sold it directly to a private utility company for consumer resale, essentially functioning as a wholesaler of electric power. In reviewing the VDPS arrangement, the Commission, departing from its own precedent, concluded that VDPS could not qualify as a "public body" because it was not "capable of selling and distributing power directly to consumers of electricity at re-

tail." *Id.* at 590 (quoting *Opinion No. 229,* 30 FERC at 61,651). Because VDPS neither sold nor distributed power directly to consumers at retail, the Commission concluded that VDPS did not foster the requisite "yardstick competition."

Building on our analysis in *PASNY,* we affirmed the Commission's orders that found PASNY's allocation of preference power to both MTA and VDPS to be impermissible. Once again, we carefully analyzed the legislative history of the NRA. *Id.* at 591–93. We concluded that the Commission correctly interpreted the term "public bodies" to encompass only publicly owned entities capable of selling and distributing electric power at retail. *Id.* at 593. Moreover, we held that the allocation of preference power to end-users such as MTA or to entities such as VDPS, that essentially acquired power and then resold it to a private utility for retail sale, failed to advance the NRA's statutory purpose of encouraging rate competition. *Id.* at 592.

### B. *The Complaints Underlying this Appeal*

Prior to our decision in *MTA,* but in response to the Commission's order, the Vermont Legislature on April 23, 1985 enacted legislation aimed at satisfying the Commission's newly articulated "public body" definition. *See* Vt.Stat.Ann. tit. 30, § 212a. That legislation authorized VDPS to distribute and sell at retail electric power purchased from the Niagara and St. Lawrence River power projects. To accomplish this objective, the legislation authorized VDPS to enter into leasing agreements with private utility companies whereby VDPS would lease facilities from these entities and they in turn would provide VDPS with the services necessary to distribute Niagara preference power. Pursuant to this authorization, VDPS entered into a number of agreements with privately owned utilities aimed at accomplishing the sale and distribution of Niagara preference power directly to retail customers.

Similarly, in the early 1980s, a number of New York municipalities, seeking to reduce electricity rates for their citizens, formed "municipal distribution agencies" (MDAs). Pursuant to the authority conferred upon them by state and local law, the MDAs entered into contractual agreements whereby they leased electric distribution facilities from private IOUs. Through this type of leasing arrangement, the MDAs, like VDPS, sought to satisfy the Commission's "public body" definition.

On July 1, 1985, PASNY began to sell Niagara preference power to a number of New York MDAs. These allocations had the effect of reducing the amount of preference power available to other New York preference customers such as the members of the MEUA. On February 14, 1986, MEUA filed a complaint against PASNY with FERC. MEUA charged that the lease and operating agreements (LOAs) entered into by the New York MDAs with private utility companies did not qualify the MDAs as "public bodies" as defined by the Commission and this Court and that PASNY's decision to allocate preference power to the MDAs, therefore, violated the terms of its license and the NRA. Subsequently, on March 13, 1986, CMEEC and MMWEC filed similar complaints challenging PASNY's decision to allocate preference power to VDPS. The Commission consolidated the two complaints and ordered an evidentiary hearing before an ALJ.

### C. *The ALJ's Findings and Conclusions*

After an administrative hearing that encompassed more than one year and a review of thousands of pages of evidence, the ALJ issued his decision. *Initial Decision,* 42 FERC ¶ 63,018 (Feb. 16, 1988). The ALJ found that neither the New York MDAs nor VDPS qualified as a "public body" entitled to an allocation of Niagara preference power. *Id.* at 65,170, 65,172. In making this finding, the ALJ concluded that the use of leasing agreements does not in itself make a public entity ineligible for the receipt of preference power. Indeed, the ALJ found that a publicly owned entity can satisfy the "public body" test by leasing electric distribution facilities, but only if the public entity satisfies certain criteria. *Id.* at 65,163–64.

First, the public entity must provide "yardstick competition" for private investor owned utilities. The ALJ reasoned that to perform this function a "public body" must provide both consumers and regulators with a "benchmark" with which to compare the rates and quality of service offered by private utility companies. In his decision, the ALJ articulated a three step analysis to determine when a publicly owned entity functions as a "yardstick competitor:"

(a) it creates a threat of takeover or displacement of private investor owned utilities;

(b) it substantially meets the energy needs of its customers; and

(c) it provides consumers and regulators with a basis for comparing the rates and quality of service of public and private utilities.

*Id.* at 65,164. Second, the publicly owned entity must be directly responsible for meeting the requirements and responding to the concerns of its retail customers, and it must have the ability to initiate corrective action. *Id.* Third, the entity must have "control" of the distribution system. The ALJ defined control as the authority to "manage a system without restraint." *Id.* at 65,165. Specifically, the entity must have the ability to adopt cost cutting measures and to ensure continuity of service. Applying this standard, and focusing on the question of control over distribution instead of generation, the ALJ concluded that neither the New York MDAs nor VDPS qualified as a "public body."

Regarding the MDAs, the ALJ found that the terms of their lease agreements failed to shift the ultimate responsibility for the provision of electrical service away from the private utilities. *Id.* at 65,169–70. Indeed, the private utility maintained exclusive physical control over the distribution facilities and reserved the right to terminate the LOAs in certain circumstances. Finally, the ALJ concluded that the bills sent to consumers failed adequately to inform them of the source, price and nature of the service being offered by the MDAs. The bills only contained a notation that the consumer was saving a specified amount as a result of the availability of preference power and did not make it sufficiently clear to consumers who, in fact, was providing the service.

With regard to VDPS, the ALJ concluded that it came closer than the MDAs to satisfying the "public body" test because VDPS had the ability to provide its service to virtually any resident upon request. *Id.* at 65,171–72. The ability to provide service, however, was counterbalanced by the need for a resident to be a customer of a private utility as a prerequisite to obtaining VDPS service. The responsibility for billing, metering, delivery and virtually all other services also remained with the private utility. Thus, the ALJ found that VDPS bore no direct responsibility to its customers. Finally, the private utility maintained exclusive control over the physical plant and distribution facilities and indemnified VDPS from tort liability. These factors led the ALJ to conclude that VDPS did not satisfy the "public body" test.

The ALJ did not grant any retroactive relief and deferred to the Commission on the question of prospective relief. *Id.* at 65,173.

### D. *FERC's Review and Decision*

On review, the Commission affirmed the ALJ's findings and adopted his reasoning. *See Opinion No. 329*, 48 FERC ¶ 61,124. In addition, the Commission rejected complainants' proposed remedy. Complainants had sought to impose a requirement on PASNY to obtain Commission approval prior to allocating preference power in the future. Instead, the Commission decided that in the future PASNY must engage in a careful examination of the public entities that seek to acquire preference power. Additionally, PASNY must make an informational filing outlining the factors on which it has relied to conclude that an entity to which it proposes to sell preference power qualifies as a public body. *Id.* at 61,478.

### DISCUSSION

Petitioners collectively advance several challenges to FERC's *Opinion No. 329*.

Petitioners PASNY, VDPS and the New York MDAs challenge the Commission's "public body" criteria on two grounds: (1) the criteria are contrary to law, and (2) the criteria adopted are neither reasoned nor supported by substantial evidence. VDPS and the MDAs also assert that assuming the propriety of the new criteria, the Commission erred when applying the test to each of them. In addition, petitioner Rhode Island submits that states are exempt from the Commission's "public body" test. Petitioners Allegheny, CMEEC and MMWEC challenge FERC's refusal to impose on PASNY a requirement that all future allocation decisions be subject to prior FERC approval.

## A. *The Scope of Review*

■ Petitioners challenge the Commission's interpretation of the language of the NRA and the factual findings of the ALJ. Petitioners submit that in formulating the "public body" test the Commission misconstrued the NRA. As previously noted, FERC is the agency that is responsible for administering the NRA. When questions involving statutory construction arise, "great deference" must be accorded "to the interpretation given the statute by the officers or agency charged with its administration." *PASNY*, 743 F.2d at 103 (quoting *Connecticut Fund for Environment, Inc. v. EPA*, 696 F.2d 169, 173 (2d Cir. 1982)). As the Supreme Court has declared, "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (*Chevron*) (footnote omitted). Therefore, unless the statutory language is clear and unambiguous, a reviewing court must defer to a reasonable administrative interpretation. *Id.* at 842–44, 104 S.Ct. at 2781–83. *See also NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987).

■ Petitioners also contest the factual findings of the ALJ. They submit that even if we conclude that the Commission's "public body" criteria are not contrary to the NRA, the determination that VDPS and the MDAs failed to satisfy these criteria was the product of unreasoned decision-making and was not supported by "substantial evidence." Section 313 of the Federal Power Act, *as codified,* 16 U.S.C. § 825*l* (b), expressly provides: "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." *See also* 5 U.S.C. § 706(2); *PASNY*, 743 F.2d at 110–11. Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). The Federal Power Act's substantial evidence test "is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." *Maryland People's Counsel v. FERC*, 761 F.2d 768, 774 (D.C. Cir.1985). Thus, we must determine "whether [FERC's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In applying this standard, we must be able to discern from the record the basis for the Commission's actions. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 *reh'g denied,* 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947).

With these standards in mind, we turn to the issues raised by petitioners.

## B. *"Public Body" Criteria*

### 1. Consistency with the NRA

Initially, we must determine whether the Commission's "public body" criteria are consistent with the language and purpose of the NRA and with our prior decisions. Petitioners challenge the Commission's three pronged "public body" test, asserting

that the "public body" criteria are not mandated by the NRA and are inconsistent with the statute's purpose. Specifically, petitioners contend that two of the "yardstick competitor" elements—meeting the substantial needs of the public entity's customers and posing a threat of takeover to private entities—are "inventions" of the Commission, without any basis in law.

Petitioners advance several arguments in support of their position that the "public body" criteria undermine the very purpose of the NRA and are inconsistent with our prior decisions. First, they argue that through their leasing arrangements they possess the capability to distribute power at retail, thereby satisfying the definition of "public body" adopted in *MTA.* Second, they contend that the Commission misapplied the principle of "yardstick competition." Specifically, they note that their rates are a matter of public record and can serve as a comparative benchmark when regulators set a private utility's rate of return. They argue that a "public body" need not create a threat of physical takeover or serve substantially all of its customers needs to provide yardstick competition. Third, petitioners assert that it is not necessary for a public entity to "control without restraint" the distribution system. They submit that in adopting this criterion, the Commission has imposed a *"de facto"* ownership requirement. We find petitioners' arguments to be unavailing.

■ Petitioners are correct in noting that the statute itself does not impose these strict standards and that prior case law has not expressly imposed such eligibility criteria. Indeed, the term "public body" is not defined in the NRA. The absence of an express statutory mandate or a direct pronouncement of law by the courts, however, does not preclude an agency from adopting standards that it deems essential to the effective implementation of the statute it has been directed to administer. An agency must have the latitude to adopt standards that may evolve over time as long as those standards are consistent with the statute's purpose and are not contrary to law.

■ In an instance such as this, where Congress has not directly addressed the precise question at issue, a reviewing court "does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnotes omitted). Congress entrusted the Commission with the responsibility for the administration of the NRA. The Commission, due to its cumulative experience and expertise, is particularly well suited to this task. Unless the Commission's interpretation is inconsistent with the plain language of the statute or with the intent of Congress, we will defer to the Commission's construction as long as it is "reasonable." *Id.* at 845, 104 S.Ct. at 2783.

Here, the ALJ methodically examined the leasing arrangements entered into by the New York MDAs and VDPS. In reaching his decision, the ALJ placed great reliance on our opinion in *MTA.* In that opinion, Judge Mansfield stated: "Literally, the term 'public bodies' is not limited to 'publicly-owned entities that are capable of selling and distributing power directly to consumers of electricity at retail.' However, the legislative history of the NRA demonstrates that that is what Congress intended the term to mean." *MTA,* 796 F.2d at 591.

Thus, we have expressly accepted the proposition that in order to qualify as a "public body" an entity must actually deliver its energy to retail customers. Consumers will benefit from the existence of "preference power" only if that power is made available through the market for consumer purchase. As we have noted, "[i]f the 'public body' used the preference power itself, the privately-owned [utilities] would not face any pressure to reduce the prices they charge other customers." *MTA,* 796 F.2d at 592. Similarly, the sale of this preference power directly from a public entity to a private company for resale to the public fails to create any sort of com-

petitive pressures on the private utility. *Id.*

In *Opinion 329*, the Commission emphasized the importance of maintaining the competitive scheme initially envisioned by Congress wherein the customers of private utilities would not receive preference power directly, but rather would indirectly receive the benefits in the form of lower rates spurred by increased competition. As the Commission explained:

> Congress did not intend the customers of IOUs to receive preference power, but rather mandated that they receive the benefit indirectly through the lower rates the private utilities would charge in response to the competition from the public bodies receiving preference power. Thus, the MDAs' and VDPS's argument that they can give a greater number of end-users access to the power is irrelevant if the MDAs and VDPS do not themselves sell and distribute the power directly to the retail consumer, but instead are giving that access to the customers of IOUs.

48 FERC at 61,467.

The test articulated by the ALJ and adopted by the Commission is an attempt to clarify further the requisite characteristics of a "public body." In *MTA*, we noted that FERC has expressly declined to rule on the legitimacy of the kind of leasing arrangements currently before us. 796 F.2d at 591. We, therefore, did not rule on the issue. Given our silence, the ALJ undertook a detailed inquiry into the nature of the leasing arrangements entered into by the New York MDAs and VDPS.

The ALJ engaged in a careful analysis and rendered a thoughtful decision expanding on concepts we initially articulated in *PASNY* and *MTA*. In those cases, we emphasized the importance of direct retail distribution of Niagara preference power and focused on the benefits of competition. Here, the Commission reasoned that competitive benefits cannot fully be realized when a public entity simply enters into an arrangement with a private utility to distribute preference power, unless that public entity has an active role in the day-to-day distribution operations. The lease arrangements before the Commission vested the lessee public entities with few if any substantive rights. Rather, these agreements essentially provided the lessees with the right to pass their preference power on to consumers through a private utility's distribution system. The Commission concluded that such agreements do not provide private utilities with any incentive to achieve cost reductions or operating efficiencies.

VDPS, the MDAs and PASNY submit that the Commission's adoption of the "public body" criteria will actually result in reduced competition because LOAs allow for public entities to compete without having to expend vast sums to acquire distribution facilities. As petitioners have argued:

> Satisfying FERC's requirements of control without restraint, meeting the substantial needs of the utility's customers and posing a threat of takeover require such huge expenditures of public funds that few, if any, public utilities would try to meet the criteria in order to qualify for the limited amounts of preference power available.

We think petitioners have overstated their case. Ownership is not required by the Commission. Indeed, LOAs that afford the lessee operational control would satisfy the test.

Although we might not have adopted these exact criteria had we analyzed these issues in the first instance, the Commission's construction of the statutory term "public bodies" is not so unreasonable as to amount to an arbitrary and capricious action. In reviewing the Commission's construction, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citations omitted).

■ The Commission's "public body" test strikes a delicate balance. While not requiring public entities directly to own

distribution facilities, the test does require such entities to have active management control over the distribution of preference power. Absent such a requirement, the competitive role that we deem essential for "public body" status could not be achieved. We therefore find FERC's "public body" test to be consistent with the purposes of the NRA and the reasoning of our prior decisions.

## 2. The Factual Findings

Petitioners also challenge the factual findings that provided the basis for *Opinion No. 329*. They submit that the ultimate conclusions of the Commission are unsupported by the evidence and amount to "arbitrary and capricious" action. Specifically, VDPS and the MDAs assert that even assuming the correctness of the "public body" criteria, the Commission's finding that they did not satisfy these criteria was not supported by substantial evidence and was an exercise of unreasoned decision-making. Petitioners argue that the ALJ and the Commission failed to address adequately in their respective opinions the factual evidence that was introduced. Additionally, they assert that the Commission has imposed a *"de facto"* ownership requirement and that this represents an unexplained change in policy. Finally, petitioners contend that the Commission failed to consider several relevant factors when adopting the "operational control" component of the "public body" test. We find these arguments to be without merit.

Initially, we note that the record of the proceedings before the ALJ consists of thousands of pages. Both the petitioners and the complainants below introduced documentary and testimonial evidence. Nothing in the record suggests that the ALJ did not carefully consider and evaluate all the evidence before rendering his decision. Indeed, the ALJ's decision indicates that the contrary is true.

The assertion that the Commission failed to consider evidence presented by petitioners simply is not supported by the record. Indeed, the factual findings of the Commission encompass all of the specific points now being raised. Both the ALJ and the Commission carefully considered each of the factors on which the petitioners presently rely. These challenges to the application of the "public body" test in our view are nothing more than veiled attempts at collaterally attacking the "public body" criteria.

Moreover, we find no basis for the argument that the Commission in some way abdicated its responsibility by adopting the ALJ's findings and conclusions. After reviewing *Opinion No. 329*, we are satisfied that the Commission evaluated the ALJ's decision and all the arguments advanced by the parties and that its ultimate conclusions were supported by substantial evidence.

### a. *The MDAs and the "Public Body" Test*

The MDAs submit that their LOAs with the IOUs satisfy the "public body" criteria. Specifically, they assert that they (1) provide "yardstick competition," and (2) that the LOAs provide them with a sufficient degree of control over the distribution of power. Regarding the first point, the MDAs contend that the Commission ignored the fact that they compete directly with IOUs and that each kilowatt hour sold by a MDA is a kilowatt hour lost to an IOU. Additionally, they note that their rates are a matter of public record and are therefore available for regulatory comparison. Finally, the bills received by MDA customers reflect the difference in cost resulting from the provision of MDA power instead of IOU power. With regard to the second point, the MDAs submit that the record demonstrates that they maintain a high level of control over distribution. Specifically, they select their customer base, determine the amount of power to be sold to each customer, and set their own rates.

The LOAs entered into by the MDAs were a part of the record and the subject of close examination. In particular, the Commission analyzed the terms of the lease and operating agreement entered into by NYC-PUS (one of the MDAs) and Consolidated Edison Co. (Con Ed)—a New York based IOU. Because the terms of the LOAs en-

tered into by the other MDAs parallelled those of the NYCPUS/Con Ed agreement, the Commission focused its attention on this one agreement. *Initial Decision*, 42 FERC at 65,169. The Commission reached several conclusions. First, the ultimate responsibility for control of distribution remained with Con Ed. Indeed, the LOA expressly provided that Con Ed retain the franchise responsibility for providing service and that it be vested with the "exclusive control" over the entire distribution system. Second, Con Ed functioned as the operating agent for NYCPUS with responsibility for billing, metering and collection. Third, Con Ed retained the right to suspend the LOA in the event that provision of preference power resulted in higher energy costs for consumers. Fourth, Con Ed reserved the right to terminate the LOA if the MDA initiated condemnation proceedings or if compliance with the agreement would result in an increase in Con Ed's rates or a reduction in net income available for stockholders below the level that would pertain in the absence of the LOA. Fifth, a prerequisite to receipt of "preference power" was being a customer of Con Ed. *See Opinion No. 329*, 48 FERC at 61,471.

All of these conditions were expressly enumerated in the LOA. The Commission reasonably concluded that to compete with IOUs public entities must have the ability to manage and change those variables that affect costs and service. These LOAs provided no such flexibility. Instead, all responsibility for operations rested with the IOU. As the Commission appropriately explained:

> In addition ..., the consumer must be a customer of the privately owned utility, or service is not available. Thus, the consumer has no real choice between utilities. There is insufficient separation of

functions between the MDAs and the IOUs to create a threat of displacement, to allow the MDAs substantially to serve their customers' needs, or to provide an opportunity for rate comparison.

*Id.*

Given the express conditions of the LOAs and in light of the entire record, we conclude that there was substantial evidence in the record to support the Commission's conclusion that the MDAs lacked the requisite degree of control over distribution. As discussed above, we agree with the Commission that the exercise of such control is essential to a finding of "public body" status.

### b. *Applying the "Public Body" Test to VDPS*

■■■ Petitioner VDPS attacks the Commission's finding that it fails to qualify as a public body, challenging the Commission's decision regarding the "yardstick competition" prong of the "public body" test. VDPS asserts that it clearly satisfies this test because it supplies a substantial percentage of Vermont residents' electricity needs. VDPS also submits that it presents a clear competitive threat to IOUs and that billing statements clearly identify VDPS as the source of a customer's power.[1] Finally, VDPS, like the MDAs, submits that the LOAs provide it with a "sufficient" degree of control over distribution.

VDPS entered into LOAs with various IOUs in Vermont for the purpose of distributing Niagara preference power to consumers. Under these LOAs, VDPS obtains the right to use of the IOUs' distribution facilities. However, like the MDAs, VDPS has no responsibility for the maintenance, construction, or operation of the distribution facilities. The billing, metering and collection responsibilities are also performed by

---

**1.** With regard to the issue of rate comparisons, VDPS argues that the Commission improperly refused to consider a statute passed by the Vermont Legislature on May 27, 1987. *See* Vt.Stat. Ann. tit. 30, § 212f. This legislation directs that all electric bills provide consumers with information regarding the amount of electricity supplied by VDPS and the price per kilowatt hour of the VDPS electricity. The legislation was passed after the close of the administrative record in this case. The ALJ took official notice

of this statute, but did not permit its introduction into the record. The Commission also declined to allow it into the record. We agree with the Commission that this evidence was irrelevant because the statute was not in place at the time of the challenged allocations of preference power. Moreover, FERC has a great deal of discretion over when to close an administrative record. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978).

the IOUs. "In short, the distribution and customer service functions that a customer expects ... are performed by the [IOUs], not by VDPS." *Id.* at 61,474. Most importantly, the Commission concluded that under lease arrangements like those entered into by VDPS and the MDAs, the public entities essentially are precluded from competing with the IOUs on a cost basis. As the Commission stated in reference to VDPS's arrangement:

> [S]ince VDPS leases its distribution facilities from the IOUs, and the IOUs actually operate them, the distribution costs which are supposed to provide some part of the benchmark against which to judge IOU performance are those of the IOUs. Thus no benchmark is possible, and VDPS does not foster yardstick competition.

*Id.* Simply stated, the Commission concluded that the distribution costs of the lessee public entity and the lessor private utility will always be the same. We find this to be the most compelling argument against the form of leasing arrangement that is before us. If spurring competition is the objective of the NRA, it is difficult for us to see how the leasing arrangements at issue advance that fundamental objective.

As in many cases, VDPS points to parts of the record that tend to undermine the Commission's conclusions. However, we are acutely aware that the ALJ was charged with the responsibility of resolving these apparent inconsistencies. After a thorough review of the record, we conclude that the Commission's determination that VDPS's leasing agreements failed to satisfy the "public body" test was supported by substantial evidence.

## C. *Rhode Island's Argument*

The State of Rhode Island does not challenge the substance of the Commission's "public body" test; rather, it asserts that the test should not apply to states. Rhode Island argues that the test undermines the role of the states under the NRA. Specifically, Rhode Island takes exception to the criteria that must be met to qualify as a "public body." Rhode Island argues that the term "public body" neces-

sarily encompasses states and that states should not have to engage in the sale of preference power to retail consumers in order to obtain an allocation of preference power under the NRA.

In support of this argument, Rhode Island points to specific language in the NRA that permits ten percent of the Niagara Project's "preference power" to be allocated "for use within reasonable economic transmission distance in neighboring States." 16 U.S.C. § 836(b)(2). The statute goes on to provide: "The arrangements made by the licensee [PASNY] for *the sale of power to or in such States* shall include observance of the preferences in paragraph (1) of this subsection." *Id.* (emphasis added). From this and similar language in the statute, Rhode Island surmises that states were among the intended beneficiaries of the NRA and that states are statutorily entitled to an allocation of preference power even if they do not directly sell power to consumers at retail. We disagree.

We see no indication that Congress intended states to be treated differently from other municipal and public utilities. The NRA's primary objective is to encourage rate competition with private investor owned utilities so that consumers can benefit from reduced electric costs. To treat states differently from other public entities would undermine this statutory purpose. Indeed, our analysis in *MTA* directly addresses the arguments being advanced by Rhode Island. In *MTA*, we held that an allocation of preference power to "end-users" fails to advance the NRA's objective of enhancing rate competition. We concluded that to be a "yardstick competitor" a recipient of an allocation of preference power must sell directly to retail consumers. Nothing in our opinion suggested that any entity, including a state, was to be exempt from this requirement. As we unequivocally stated:

> Indeed, if preference power were made available to all government bodies, whether or not they distributed that power to consumers, every town and local library would be entitled to claim a direct share. Niagara hydropower would be spread so thin that any competitive effect it might have had would be lost.

*MTA*, 796 F.2d at 592. Similarly, an allocation of preference power to a state to distribute the energy as it sees fit does not advance the statute's purpose. We therefore reject Rhode Island's invitation to carve out an exception for states and we see no justification for treating a state more favorably than any other public entity.

Rhode Island also advances various Federalism-based arguments to support its position that states should be treated differently from other public entities. We have considered those arguments and find them to be unpersuasive.

### D. *FERC's Denial of Prospective Relief*

When the Commission affirmed the findings and conclusions of the ALJ, it chose not to impose the prospective relief sought by petitioners Allegheny, CMEEC and MMWEC. These entities sought to have imposed on PASNY a requirement that it obtain FERC approval prior to allocating preference power to entities other than rural electric cooperatives and traditional retail municipal electric utilities in the future. Allegheny, CMEEC and MMWEC asserted that such a remedy was appropriate because of PASNY's repeated failure to comply with previous FERC and court rulings when making its allocation decisions. The Commission ordered that PASNY must make an informational filing with the Commission ninety days prior to the effective date of an allocation. This filing must outline the determinations on which PASNY has relied to conclude that the entity to which it proposes to sell preference power qualifies as a "public body." *Opinion No. 329*, 48 FERC at 61,478.

As we have stated on a prior occasion, the Commission has "broad discretion in determining what relief is appropriate to remedy a violation of the NRA" and "the remedy should be reasonably commensurate with the needs of the case." *PASNY*, 743 F.2d at 112. Here, the ALJ found that PASNY had acted in good faith. Given this finding, the Commission's decision not to require PASNY in the future to obtain approval before allocating preference power did not constitute an abuse of discretion.

Indeed, we think the Commission properly balanced all the factors that were before it and fashioned a thoughtful and appropriate remedy which may adequately accommodate and protect the interests of all the parties involved.

### CONCLUSION

We, therefore, conclude that the Commission's newly articulated "public body" test is consistent with the history and purpose of the NRA. The Commission's findings that VDPS and the MDAs as currently constituted are ineligible for the receipt of Niagara preference power were supported by substantial evidence. Additionally, we reject Rhode Island's contention that states should be exempt from the "public body" test. Finally, we agree with the Commission's choice of remedies.

The petitions for review are denied.