**FRIENDS OF THE OMPOMPA-NOOSUC, State of Vermont, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 1498, 1681, Dockets 92–4013, 92–4015.

United States Court of Appeals, Second Circuit.

Argued May 20, 1992.

Decided July 8, 1992.

---

1550

Ronald A. Shems, Asst. Atty. Gen. State of Vt., Montpelier, Vt. (Jeffrey L. Amestoy, Atty. Gen. State of Vt., Montpelier, Vt., Ronald J. Wilson, Charles E. Magraw, Wilson Cotter & Magraw, Washington, D.C., of counsel), for petitioners.

Eric Christensen, F.E.R.C. (William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., of counsel), for respondent.

Before: PRATT, ALTIMARI and FRIEDMAN [*], Circuit Judges.

ALTIMARI, Circuit Judge:

The Friends of the Ompompanoosuc, an environmental group, and the State of Vermont (collectively "Vermont" or "petitioners") seek review pursuant to 16 U.S.C. § 825l (1988) of a decision and order of the Federal Energy Regulatory Commission ("FERC" or "Commission"), which denied their request for a hearing to reconsider FERC's grant of a license for the construction and operation of a hydroelectric power station at Thetford Center Falls on the Ompompanoosuc River in Orange County, Vermont. Petitioners claim that FERC: (1) violated the Federal Power Act, 16 U.S.C. § 792 et seq. (1988) ("FPA") by failing to consider relevant information in granting the license; (2) made findings unsupported by substantial evidence; (3) violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. (1988) ("NEPA") by not preparing an environmental impact statement ("EIS"); and (4) violated various federal regulations by not holding a public hearing, by not disseminating an environmental assessment supplement, and by not considering alternatives to granting the license.

For the reasons set forth below, we affirm.

## BACKGROUND

In 1985, Richard Balagur applied for a license to build and operate a hydroelectric power facility (the "Project") at Thetford Center Falls, also known as Great Falls, on the Ompompanoosuc River near Thetford Center, Vermont. The Project area, a sylvan setting in rural Vermont, includes the Great Falls, the Thetford Center Covered Bridge, and certain structures of historic interest. The Great Falls are Vermont's only free-flowing falls next to a covered bridge. The site formerly contained a 100 foot Army Corps of Engineers hydropower dam which was breached in the 1920's and not repaired.

According to the application, the license would allow Balagur to restore the dam by adding two to four feet of new material, so that the height of the dam would be raised to its historic level of 8.5 feet. As a result of this construction, the existing 2.6 acre reservoir at the site would be increased by 0.4 acres. The application also explained that a 400–foot long penstock would connect the dam to a 18–foot by 25–foot pow-

* The Honorable Daniel M. Friedman, United States Court of Appeals for the Federal Circuit, sitting by designation.

erhouse containing a 350 kilowatt generator.

In order to minimize adverse environmental effects and to preserve the historic and aesthetic qualities of the site, Balagur's application proposed a number of "mitigation" measures. Among other things, Balagur proposed that minimum flows be maintained over the falls, construction activities be kept away from the Thetford Center Covered Bridge as well as from historic ruins and archaeological sites, that the powerhouse be built behind a screen of trees, that the transmission wires be buried, and that a brick or wood facing be put on the dam and the powerhouse to blend these structures with the surroundings.

After receiving the application, FERC also received comments from local, state, and federal agencies. The Commission also obtained comments on the application from local citizens and citizens groups, including petitioner Friends of the Ompompanoosuc, and from petitioner State of Vermont. Based on these comments and on other information in the record regarding the project and its environmental impact, FERC issued an environmental assessment ("EA") in 1987. The EA concluded that the Project would be useful in meeting power needs and that Balagur's proposed mitigative measures in Project design and construction would minimize adverse environmental effects, such as decreased scenic attractiveness and reduced recreational opportunities, to acceptable levels. Accordingly, the EA found that the Project "would not constitute a major federal action significantly affecting the quality of the human environment." As a result of this determination, an environmental impact statement was not necessary for the Project. *See* 40 C.F.R. § 1508.13 (1991). In addition, a Safety and Design Assessment accompanying the EA found that the Project could be produced safely, in accordance with water resource development plans, and that power could be successfully marketed.

Based on additional comments and information received after release of the EA, including submissions by petitioners, and on further mitigation measures proposed by Balagur, FERC issued an environmental assessment supplement ("EA Supplement"). The EA Supplement addressed petitioners' concerns that the Project, among other things, was inconsistent with existing state environmental plans, and that the Project would have serious adverse effects on recreation, particularly swimming. The EA Supplement adhered to the EA's finding that the Project would not have a significant impact on the quality of the human environment.

As a result of the EA and the EA Supplement, FERC issued an order in May 1989 granting Balagur a license for the Project. In its order, the Commission weighed and rejected claims that the Project would destroy the Great Falls and its environs as a visual, cultural, historical, and recreational resource. FERC also found no conflict between the Project and existing state environmental plans. However, to minimize disruption to the environment, FERC conditioned the license on the implementation of mitigative measures, including setting minimum flow requirements for the falls which would approximate natural flows during the summer and fall, the busiest season for the Falls, and requiring continued public access to the Falls.

After FERC issued the license, Vermont petitioned for rehearing and reconsideration, claiming a variety of procedural and substantive irregularities in licensing the Project. Among other things, Vermont contended that FERC failed to give adequate consideration to state comprehensive environmental programs; that substantial evidence did not support FERC's findings regarding the effect of reduced flow rates over the Falls; and that FERC improperly failed to perform an environmental impact statement, *i.e.*, that the EA and EA Supplement were defective in finding that the Project would have no significant impact to the human environment.

In a reasoned opinion, FERC rejected these challenges. In so doing, however, FERC further required, as a condition of the license, that Balagur study alternative

sites and prepare a plan for the development of a swimming area to replace the "popular swimming hole" that would be lost. Petitioners remained unmollified, and this appeal followed.

## DISCUSSION

### I. Consideration of Relevant Factors Under The FPA.

#### A. Uniqueness, Local Import, and Opposition.

■ Under the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a–3 *et seq.* (1988), Congress directed FERC to encourage development of small hydroelectric plants, such as the one at issue here, in order to reduce the nation's dependency on fossil fuels. *See FERC v. Mississippi,* 456 U.S. 742, 750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532 (1982). In deciding whether to grant a license to build such a plant, the FPA requires FERC to, among other things, give equal consideration to power and development purposes and "to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife ..., the protection of recreational opportunities, and the protection of other aspects of environmental quality." 16 U.S.C. § 797(e) (1988). *See also United States Department of Interior v. FERC,* 952 F.2d 538, 545 (D.C.Cir. 1992).

On appeal, petitioners contend that FERC erred in not considering relevant factors in its licensing decision. *See Udall v. F.P.C.,* 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967) (under the FPA the Commission must explore "all issues relevant to the 'public interest'"). Specifically, petitioners argue that the Commission failed to consider the uniqueness of the Project site, the Falls' importance to the local community, and the degree of opposition to the Project.

In reviewing a decision by FERC, a court must evaluate whether the decision was based on a "consideration of the relevant factors and whether there has been a clear error of judgment." *Allegheny Elec. Co-op, Inc. v. FERC,* 922 F.2d 73, 80 (2d

Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

In the present case, FERC carefully considered the effects of the Project on: the aesthetic value of Great Falls and its environs; the flow rate of the Falls; the cultural and historical significance of the site; the geological uniqueness of the Falls; and the decrease in recreational opportunities available at the Project site. Indeed, in its order denying reconsideration, FERC specifically noted that Vermont claimed that the Commission "has ignored the fact that the Great Falls site is the State of Vermont's only remaining rural village waterfall site without hydropower development." Although FERC did not elaborate on this objection separately, the Commission was clearly aware of the issue and considered it under the topics listed above.

Further, it cannot be said that FERC ignored the local importance of the Falls or the existence of opposition to the Project. The Commission specifically addressed these concerns in the EA, the EA Supplement, the order issuing the license, and the order denying rehearing. Indeed, FERC's entire thrust in requiring mitigation measures was to preserve the integrity of the Falls area while at the same time balancing legitimate hydropower needs. *See Swinomish Tribal Community v. F.E.R.C.,* 627 F.2d 499, 512 (D.C.Cir.1980) (noting that Commission's requirement of extensive mitigation measures aimed at minimizing the aesthetic impacts of the project demonstrated that it seriously considered those impacts); *see also Hanly v. Kleindienst,* 471 F.2d 823, 832 (2d Cir.1972) (affirming agency decision that mitigation measures would minimize aesthetic impact of project), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

Under these circumstances, we believe that FERC fulfilled its obligations under the FPA. *See National Wildlife Federation v. FERC,* 912 F.2d 1471, 1480–82 (D.C.Cir.1990). That petitioners disagree with FERC's conclusion that the Project

will not have significant adverse environmental effects is simply an insufficient basis upon which to overturn FERC's decision.

### B. *State Comprehensive Plans.*

■ Pursuant to the FPA, in developing a "comprehensive plan" for the Project, FERC "shall consider ... the extent to which the project is consistent with a [state] comprehensive plan ... for improving, developing, or conserving a waterway ... affected by the project." *See* 16 U.S.C. § 803(a)(2)(A)(i) (1988). Petitioners argue that FERC failed to give sufficient consideration to conflicts between the Project and the Vermont state report on the Waterfalls, Cascades, and Gorges of Vermont ("Waterfall Study") and the Vermont State Comprehensive Outdoor Recreation Plan ("SCORP"). This argument is unpersuasive.

Although FERC must "consider" inconsistencies with state plans, a license need not be denied merely because a state agency opposes a particular project. *See, e.g., National Wildlife Federation,* 912 F.2d at 1482 ("[FERC's] actions are not subject to the effective veto of every state or federal ... agency...."). "Rather, the Commission is required to give due consideration to all recommendations from relevant agencies, to reconcile inconsistencies between those agencies' recommendations and the Commission's plans to the extent possible, and to explain its reasons for departing from the agencies' recommendations when it concludes that it must do so in order to fulfill its statutory mandate." *Id.* at 1482.

FERC admitted in its order denying rehearing that the Project conflicted with the Waterfall Study's recommendation against development in the Thetford Falls area. However, after considering the Waterfall Study, FERC reasoned that mitigative measures regarding stream flows and historic preservation would minimize conflicts with the Study and appropriately balance power needs with aesthetic values. Under these circumstances, it cannot be said that FERC failed to fulfill its obligations under the FPA. *See National Wildlife Federation,* 912 F.2d at 1481–82.

As to the SCORP, FERC found that no conflict existed between the Project and this state plan. We agree. The purpose of Vermont's SCORP is "to guarantee access to recreation." SCORP policy # 9 provides that Vermont's strategy is "to increase efforts and programs which maintain and improve the quality of Vermont's lakes, rivers, and streams and which *strive to strike a balance between competing uses of these waters.*" (emphasis added). The SCORP further indicates that more access to swimming is needed in the general area of the Project. While the Project will prevent use of a local swimming hole, we find that FERC's mitigation measures requiring public access to the Project and the development of plans to create other swimming areas "strike[s] a balance" consistent with Policy # 9.

### II. *Whether Substantial Evidence Supports FERC Findings.*

Pursuant to the FPA, FERC's factual findings are conclusive if supported by substantial evidence. *See* 16 U.S.C. § 825*l*(b) (1988). "Substantial evidence" has been defined to mean " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Allegheny Elec. Co-op,* 922 F.2d at 80 (citation omitted). The FPA's substantial evidence test has therefore been described as the application of the "arbitrary and capricious" standard to factual findings. *Id.* In applying this standard, "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

In the present case, Vermont claims that the following findings made by FERC are not supported by substantial evidence: (1) that required stream flow rates minimize to acceptable levels the adverse effects to the aesthetic qualities of the Great Falls caused by the Project's drain on water; (2)

that swimming opportunities, as a result of mitigative measures, will not be lost to a significant degree; and (3) that the Project is economically viable. These findings will be discussed in turn.

### A. *Flow Rates.*

█ It is uncontested that the demands of the hydroelectric facility will significantly tap into the water currently flowing over the Falls, thereby altering their appearance. However, to balance aesthetic values with Project needs, FERC required that from October 16 to May 31, a period during which FERC determined use of the Falls was at its lowest, 5 cubic feet per second (cfs) of water flow over the falls. As FERC reasoned in the EA, rather than run at uniformly low rates, winter storms and spring rains periodically will increase the flows during this time beyond the set minimum. Substantially higher flows of 32 cfs, which FERC contends will approximate natural flows, will be required during the summer and fall to accommodate recreation and foliage tours.

Contrary to petitioner's assertion that FERC uncritically accepted the minimum flow rates proposed by Balagur, the Commission carefully considered the appropriate minimum flow and arrived at a flow far higher than that proposed by Balagur. Indeed, FERC reviewed videotapes and photographs of the falls at flows ranging from 7 cfs to 123 cfs, as well as the recommendations of staff members who had actually visited the falls. After conducting its own study, FERC consulted with the U.S. Fish and Wildlife Service and the Vermont Department of Water Resources. On this basis, FERC determined that flow rates of 32 cfs be required over the falls during the summer months, rather than the 5 cfs flow Balagur had proposed. Although Vermont disagrees with FERC's decision, it is clear that FERC's conclusions regarding the adequacy of flow are not arbitrary and capricious.

Vermont also contends that FERC relied on insufficient data in determining the amount of recreational use during the winter and spring. According to Vermont, FERC overlooked people who simply drive by the Falls and appreciate the view, as opposed to those who actually engage in recreational activities. Failure to account for such sporadic and transient enjoyment does not, however, render FERC's ultimate findings infirm or make the balance struck inappropriate.

### B. *Swimming and Recreation.*

█ Vermont next argues that FERC clearly erred in finding that swimming opportunities would not be significantly curtailed. We conclude that although the "swimming hole" will be lost, FERC's finding that overall recreational swimming will not suffer significantly is supported by substantial evidence.

The license granted to Balagur not only requires access to the site where safety permits, but also requires Balagur to "study potential sites both upstream and downstream of the project, and, after consulting with the Thetford Planning Commission, the Vermont Agency of Natural Resources, and the Corps of Engineers, to prepare a plan for the development of swimming and wading opportunities in the project area." Vermont nevertheless contends that a license should not have been granted until the outcome of the studies and plans were reviewed, *i.e.,* there is no basis yet to say that adequate swimming will continue. FERC has, however, demonstrated commendable concern regarding the replacement of the swimming hole. Indeed, we view Balagur's obligation to develop plans for alternative swimming sites as entailing a further obligation to implement such plans if feasible, after consultation with the above named agencies. FERC assured this court at oral argument that since Balagur's license depended on fulfillment of that condition, FERC would assure Balagur's good faith compliance. Under these circumstances, we conclude there is a rational basis for FERC's finding that the envisaged measures will compensate adequately, though perhaps not completely, for the loss of one swimming hole.

C. *Economic Viability.*

■ Vermont next argues that FERC's decision that the Project would be economically viable is baseless because after this decision, Balagur was denied a particular rate structure by the Vermont Public Service Board. FERC responds that its decision was based on energy cost information submitted by Balagur, information gathered from New England Utilities, and on a comparison over 50 years between anticipated Project costs and fossil fuel costs. According to FERC, the "denied rate" did not enter into its economic feasibility calculations.

Resolving the issue of the economic viability of the Project "requires technical expertise and is properly left to the informed discretion of the responsible federal agency." *Friends of the River v. FERC*, 720 F.2d 93, 102 (D.C.Cir.1983). The record reflects that FERC undertook a comprehensive study of energy costs and requirements, and, consequently, FERC's determination is not arbitrary or capricious.

III. *Failure To Prepare An EIS.*

■ Vermont next contends that FERC abused its discretion under NEPA by failing to prepare an EIS. Put differently, Vermont argues that the EA and EA Supplement findings of no significant environmental impact are erroneous. We disagree.

If an agency prepares an EA and determines that a project will have no significant impact on the human environment, a costly and time consuming EIS need not be prepared. *See* 40 C.F.R. § 1508.13 (1991) (environmental impact statement required for major federal actions "significantly affecting the quality of the human environment"); *see also Town of Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir.1983), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984); *Hanly v. Kleindienst*, 471 F.2d 823, 826 (2d Cir.1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). In determining whether a proposed major federal action will have a "significant" environmental impact, federal regulations set forth criteria that

an agency *should consider*, including the unique nature of the project site, the degree to which the project's effects on the environment are "highly controversial," the degree to which the project will affect historical or cultural resources, and whether the project violates applicable environmental protection laws or requirements. *See* 40 C.F.R. § 1508.27(b)(3), (4), (8), & (10) (1991). Significantly, the regulations do not prescribe the weight to be given to these criteria. *See River Road Alliance v. Corps of Eng'rs*, 764 F.2d 445, 449 (7th Cir.1985) ("The statutory concept of 'significant' impact has no determinate meaning, and to interpret it sensibly in particular cases requires a comparison that is also a prediction: whether the time and expense of preparing an environmental impact statement are commensurate with the likely benefits from a more searching evaluation than an [EA] provides."), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

Judicial review of agency decisions regarding whether an EIS is needed is " 'essentially procedural.' " *Town of Orangetown*, 718 F.2d at 35 (citation omitted). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences." *Stryker's Bay Neighborhood Council, Inc. v. Carlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam). Accordingly, a reviewing court must "ensure that [FERC] has taken a 'hard look' at the environmental consequences . . . and . . . assess whether the agency has convincingly documented its determination of 'no significant impact.' " *Town of Orangetown*, 718 F.2d at 35.

In the present case, we conclude that FERC took the requisite "hard look" at the environmental impact of the Project on the Great Falls area. It examined the Project's impact on the aesthetic, cultural, historical, and recreational aspects of the site; it considered inconsistencies with state environmental plans; and it proposed measures to minimize certain unavoidable

environmental impacts. Under these circumstances, and given that FERC's findings regarding the adequacy of mitigative measures are supported by substantial evidence, FERC has "convincingly documented" its finding of no significant impact. *Town of Orangetown,* 718 F.2d at 35.

Petitioners argue nevertheless that because the Project was "highly controversial," one of the factors to be considered in determining significance of impact, an EIS is required. Vermont points to the opposition to the project from local residents, two governors of Vermont, and Vermont's U.S. senators. There is, however, a difference between "controversy" and "opposition." The term "highly controversial" refers to instances in which "a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Town of Orangetown,* 718 F.2d at 39 (citation omitted). Here, there is opposition and arguably controversy surrounding the Project's aesthetic impact. However, as explained by the court in *River Road Alliance,*

> [a]esthetic objections alone will rarely compel the preparation of an environmental impact statement. Aesthetic values do not lend themselves to measurement or elaborate analysis. The necessary judgments are inherently subjective and normally can be made as reliably on the basis of an environmental assessment as on the basis of a much lengthier and costlier environmental impact statement. The fact that there was public opposition ... cannot tip the balance.

764 F.2d at 451 (citations omitted). Because the controversy, if any, concerns the largely subjective issue of the falls character with various flow rates, etc., we do not believe that a more extensive EIS would facilitate the agency's decision making.

IV. *The Alleged Violation of Regulations.*

Vermont raises several claims concerning FERC's alleged failure to follow applicable federal regulations in preparing the EA and EA Supplement. Specifically, Vermont contends that FERC improperly

failed: (1) to hold a hearing; (2) to disseminate copies of the EA Supplement; and (3) adequately to consider alternatives to the Project. We address these claims in order.

■ Under 40 C.F.R. § 1506.6(c) (1991), an agency "shall hold or sponsor public meetings or public hearings *whenever appropriate.*" (emphasis added). Criteria for determining when a hearing should be held "include" whether there is (1) a "[s]ubstantial environmental controversy" and (2) "[a] request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful." *Id.*

According to Vermont, both criteria for a hearing are met in the instant case: the Project's effects are controversial and the Vermont Agency of Environmental Conservation requested a hearing in 1986. Given the arguable existence of a "controversy" surrounding the Project's aesthetic impact, we believe that a hearing might have been beneficial. Nevertheless, we do not believe that a hearing was required. *See River Road Alliance,* 764 F.2d at 451; *see also Hanly v. Kleindienst,* 471 F.2d at 835 ("neither NEPA nor any other federal statute mandates the specific type of procedure to be followed by federal agencies. There is no statutory requirement that a public hearing be held"). An examination of the record in the instant case persuades us that the Commission's failure to hold a public hearing did not preclude it from weighing all the factors essential to exercising its judgment in a reasonable manner. *Sierra Association For Environment v. FERC,* 744 F.2d 661, 664 (D.C.Cir.1984).

■ Pursuant to 40 C.F.R. § 1506.6(a) and (b)(1) (1991), agencies "shall" provide notice to interested parties of the availability of "environmental documents" concerning a proceeding, and "shall mail notice to those who have requested it in an individual action." Vermont is correct in arguing that FERC failed to comply with these requirements because it did not provide Vermont with notice that the EA Supplement had been issued. However, because Vermont received the document through a

Freedom of Information Act request two months in advance of the Order licensing the Project, Vermont had ample time to comment on the EA Supplement before the license was issued and to petition FERC for reconsideration and rehearing. Because Vermont cannot demonstrate prejudice from FERC's oversight, reversal is not appropriate on this ground.

 Finally, Vermont argues that FERC erred by failing to consider alternatives to the Project. Specifically, Vermont contends that FERC did not consider conservation as an alternative to the energy that the Project will produce. This argument is unpersuasive. It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion. *See Vermont Yankee Nuclear Power Corp. v. National Resource Defense Council,* 435 U.S. 519, 551–52, 98 S.Ct. 1197, 1215–16, 55 L.Ed.2d 460 (1978). Indeed, the range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact. *See, e.g., City of New York v. United States Dept. of Transp.,* 715 F.2d 732, 743 n. 11, 745 (2d Cir.1983) (implicitly suggesting that considering "conservation" as an alternative to energy production is not necessary), *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984). We therefore hold that FERC's failure to consider conservation as an alternative was not an abuse of discretion.

## CONCLUSION

Based on the foregoing, the decision and order of the Federal Energy Regulatory Commission denying petitioners' request for a rehearing is affirmed.